701 S.E.2d 766

**The STATE, Respondent,**

**v.**

**Adams GIBSON, Appellant.**

**No. 4747.**

Court of Appeals of South Carolina.

Heard May 19, 2010.

Decided Sept. 29, 2010.

Rehearing Denied Nov. 22, 2010.

Chief Appellate Defender Robert M. Dudek, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General Alphonso Simon, Jr., Warren Blair Giese, Solicitor, all of Columbia, for Respondent.

THOMAS, J.

During an altercation in a parking lot, Dennis Irby was shot and killed by a single 9mm gunshot. Adams Gibson and his brother Jacques Gibson were each indicted and convicted for the murder. Adams appeals, arguing the trial court erred in failing to grant a directed verdict and in failing to instruct the jury on involuntary manslaughter. We affirm.

## FACTS

In September 2005, two groups of individuals, one from Ridgeway and one from Winnsboro, met at Chance's Bar in Columbia. Although the groups seemed to be getting along most of the evening, at some point, animosity developed between Demetric Davis, of Ridgeway, and Torn Boyd, of Winnsboro. Adams testified that shortly after the initial confrontation between Davis and Boyd, he called his brother, Jacques, to request a ride home.

Twenty to thirty minutes later, Jacques and two friends, Stephon and Vernon, arrived at Chance's in Jacques's white Ford sedan to pick up Adams. Jacques went inside to find Adams, while Stephon and Vernon waited in the car. Shortly thereafter, the dispute that had brewed inside Chance's spilled out into the parking lot and erupted into a physical altercation between numerous members of each group. According to several witnesses, neither Adams nor Jacques initially engaged in the fight; however, James Smith testified he saw Adams swing at someone and when Smith approached Adams in an effort to keep him away from one of the Winnsboro fellows, Jacques brandished a gun and told him "[not to] even think about it." Smith testified he fled at the sight of the gun.

Soon after the fight erupted, witnesses testified to hearing several shots. The witness accounts of the evening provide no clear picture of who fired weapons or how many shots were fired. However, many witnesses testified to seeing either

Jacques, Adams, or both, or "someone" in the vicinity of Jacques's white car, firing multiple shots.

One of the State's key witnesses, Shunta Williams,[1] testified that she left the bar and walked out to the parking lot to watch the fight. Most of the witnesses testified that Jacques remained near his white sedan, away from the fight, while Adams may have engaged in the melee. However, Williams testified that Jacques was engaging in the fight and that she saw Adams walk over to the white sedan, sit in the driver seat, reach under it, pull out a gun, and fire what she recognized as a small caliber handgun, either a .22 or .25.[2] When the shots began, she retreated to the doorway of the bar to take cover. Moments later she claimed she heard another set of gunshots in the distance. She identified Adams as wearing jeans and a black tee shirt, although the other witnesses and evidence presented at trial indicated it was Jacques in the black tee shirt, and Adams was wearing a white tee shirt. Many of the accounts point to multiple sources of gunfire, but Williams maintains that Adams was the only shooter. During the melee, Dennis Irby was shot and killed by a single 9mm shot to the back of the left shoulder.

Adams spoke with the police twice. He first stated that he was not in the white Ford sedan with Jacques and did not see who did the shooting because he was in Lakisha Davis's car. He later admitted that after the altercation in the parking lot began, he exited Lakisha's car, at her request, to retrieve her cousin, Demetric. Adams denied having or firing a gun that night.

Jacques also gave two statements to the police. First he told the police that after he and his brother exited the bar, Adams went to Lakisha Davis's car and he returned to his white Ford sedan. He said he noticed a man retrieve something from a nearby SUV and place it behind his back, he suspected it was a gun but did not see it. After the fight broke out, Jacques stated Adams drove around in Lakisha's car, got out, and walked over toward the fighting. Although

---

1. Although there are many witness accounts, the State relies heavily on this testimony for many of the issues in this case.

2. Shell casings from a .25 caliber gun were found at the scene.

in his first statement Jacques denied he had a gun, Jacques later admitted that upon suspecting Smith was going to hit Adams, he pulled a gun and told Smith to "back off." Jacques said he then heard two shots and in response fired his 9mm three or four times "into the air" as he got in his car and drove away. He later disposed of his gun by tossing it over a bridge.

Adams and Jacques were both indicted for murder; Jacques was also indicted for possession of a firearm by a person under the age of twenty-one. The pair was tried together. At the close of the State's case, Adams unsuccessfully moved for a directed verdict. In addition, the trial court denied Adams's request to instruct the jury on involuntary manslaughter. Both Adams and Jacques were convicted of murder and sentenced to thirty years' imprisonment. Adams appeals.

## ISSUES ON APPEAL

I.    Did the trial court err in failing to direct a verdict on the charge of murder?

II.    Did the trial court err in failing to instruct the jury on involuntary manslaughter?

## STANDARD OF REVIEW

In criminal cases an appellate court sits to review errors of law only. *State v. Baccus*, 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006).

## LAW/ANALYSIS

### I. *Directed Verdict*

Adams argues the trial court erred in failing to direct a verdict on the charge of murder. We disagree.

When ruling on a motion for a directed verdict, the trial court is concerned only with the existence of evidence, not the weight. *State v. Al–Amin*, 353 S.C. 405, 411, 578 S.E.2d 32, 35 (Ct.App.2003). When reviewing the denial of a motion for a directed verdict, an appellate court must review the evidence, and all inferences therefrom, in the light most favorable to the State. *State v. Weston*, 367 S.C. 279, 292, 625 S.E.2d 641, 648 (2006). The trial court's denial of a directed

verdict will not be reversed if supported by any direct evidence or substantial circumstantial evidence of the defendant's guilt. *Id.*

In this case, the trial court denied Adams's motion for directed verdict, finding sufficient evidence had been presented to allow the case to proceed to the jury on the "hand of one is the hand of all" theory of liability. Adams argues the State presented insufficient evidence that he is responsible for the victim's murder under an accomplice theory.

Under the "hand of one is the hand of all" theory of accomplice liability, one who joins with another to accomplish an illegal purpose is liable criminally for everything done by his confederate incidental to the execution of the common design and purpose. A defendant may be convicted on a theory of accomplice liability pursuant to an indictment charging him only with the principal offense. [However, m]ere presence and prior knowledge that a crime was going to be committed, without more, is insufficient to constitute guilt. [Rather,] presence at the scene of a crime by pre-arrangement to aid, encourage, or abet in the perpetration of the crime constitutes guilt as a principal.

*State v. Thompson,* 374 S.C. 257, 261–62, 647 S.E.2d 702, 704–05 (Ct.App.2007) (internal quotations and citations omitted).

"Under an accomplice liability theory, 'a person must personally commit the crime or be present at the scene of the crime and intentionally, or through a common design, aid, abet, or assist in the commission of that crime through some overt act.'" *See State v. Condrey,* 349 S.C. 184, 194, 562 S.E.2d 320, 325 (Ct.App.2002) (quoting *State v. Langley,* 334 S.C. 643, 648–49, 515 S.E.2d 98, 101 (1999)). In order to establish the parties agreed to achieve an illegal purpose, thereby establishing presence by pre-arrangement, the State need not prove a formal expressed agreement, but rather can prove the same by circumstantial evidence and the conduct of the parties. *Id.* at 193, 562 S.E.2d at 324 (stating that under the hand of one is the hand of all theory, "[a] formally expressed agreement is not necessary to establish the conspiracy" which brings the accomplice to the scene of the crime).

In this case, the State does not contend Adams fired the fatal shot. Rather, the State simply maintains there is sufficient circumstantial evidence that Adams agreed to, and did,

act in concert with Jacques to assault the Winnsboro group; thus, sufficient evidence of Adams's guilt existed to submit the issue to the jury under the hand of one is the hand of all theory. In order to demonstrate that Adams and Jacques intended to join together in a common design to achieve an illegal purpose, the State maintains: (1) Adams called Jacques to the scene; (2) when Jacques arrived he went inside the bar and Adams pointed out the group of Winnsboro men, rather than leaving straight away; (3) Williams testified Adams approached Jacques's white sedan in the parking lot and retrieved a gun moments before the shooting; and (4) although separately, the two men fled the scene after the shooting.

Here, at minimum, the evidence creates the inferences that Adams informed Jacques of the situation, that the reason for the call may not have been solely for the purpose of removing Adams from the scene, and that Adams was aware a firearm was available for him to retrieve from Jacques's white sedan. When viewed in the light most favorable to the State, the circumstantial evidence in this case infers Adams and Jacques may have acted in concert in assaulting the men from Winnsboro. *See State v. Ward*, 374 S.C. 606, 615, 649 S.E.2d 145, 150 (Ct.App.2007) (holding in a case with similar facts, that evidence the defendant and his co-defendant together chased after two men in the melee of a parking lot brawl and fired shots, killing a bystander, was sufficient to overcome a directed verdict motion); *see also Langley*, 334 S.C. at 649, 515 S.E.2d at 101 (indicating evidence that the defendant and co-defendant were seen together, circumstantial evidence placing defendant at the scene of the crime, and eye-witness testimony, was sufficient to warrant submitting the case to the jury on any theory of liability, including the hand of one is the hand of all theory). Accordingly, we find the trial court did not abuse its discretion and affirm its denial of Adams's motion for a directed verdict.

## II. *Jury Instruction*

▇▇▇ Adams next alleges the trial court erred in failing to instruct the jury on involuntary manslaughter. We disagree.

▇▇▇▇ The evidence presented at trial determines the law to be charged, and a trial court commits reversible error in

failing to give a requested charge on an issue raised by the evidence. *State v. Knoten,* 347 S.C. 296, 302, 555 S.E.2d 391, 394 (2001). In determining whether to charge the lesser included offense of manslaughter the court must view the evidence in the light most favorable to the defendant. *Id.* Declining to charge the lesser included offense is warranted when it "very clearly appear[s] that ... *no evidence whatsoever* [exists] tending to reduce the crime from murder to manslaughter." *State v. Brayboy,* 387 S.C. 174, 179, 691 S.E.2d 482, 485 (Ct.App.2010); *State v. Cole,* 338 S.C. 97, 101, 525 S.E.2d 511, 513 (2000). In order to amount to reversible error, the failure to give a requested charge must be both erroneous and prejudicial. *State v. Patterson,* 367 S.C. 219, 232, 625 S.E.2d 239, 245 (Ct.App.2006).

■■■■ Involuntary manslaughter is:

(1) the unintentional killing of another without malice, but while engaged in an unlawful activity not naturally tending to cause death or great bodily harm or (2) the unintentional killing of another without malice, while engaged in a lawful activity with reckless disregard for the safety of others. To constitute involuntary manslaughter, there must be a finding of criminal negligence, statutorily defined as a reckless disregard of the safety of others. Recklessness is a state of mind in which the actor is aware of his or her conduct, yet consciously disregards a risk which his or her conduct is creating. A person can be acting lawfully, even if he is in unlawful possession of a weapon, if he was entitled to arm himself in self-defense at the time of the shooting. The negligent handling of a loaded gun will support a charge of involuntary manslaughter.

*Brayboy,* 387 S.C. at 180, 691 S.E.2d at 485 (internal citations and quotations omitted).

■■■■ The State argues that under the hand of one is the hand of all theory, Adams is not entitled to this charge because Jacques was either acting unlawfully or was not lawfully armed in self-defense. More specifically, the State argues extensively that because Jacques was not acting in such a manner as to entitle him to a self-defense instruction, he is thereby not lawfully armed in self-defense for the purposes of an involuntary manslaughter charge. However,

our supreme court has specifically pointed out there is a difference between being "armed in self-defense" and "acting in self-defense." [3] *State v. Light*, 378 S.C. 641, 649, n. 6, 664 S.E.2d 465, 469, n. 6 (2008); *State v. Burriss*, 334 S.C. 256, 265, n. 10, 513 S.E.2d 104, 109, n. 10 (1999); *see State v. Crosby*, 355 S.C. 47, 52, 584 S.E.2d 110, 112 (2003) [4] (stating "[a] person can be acting lawfully, even if he is in unlawful possession of a weapon, if he was entitled to arm himself in self-defense at the time of the shooting"). Thus, for the purposes of involuntary manslaughter, the inquiries associated with whether or not to instruct on the defense of self-defense are not applicable. *Light*, 378 S.C. at 648–49, 664 S.E.2d at 468–69. Rather, the court is "concerned only with whether [the defendant] had a right to be armed for purposes of determining whether he was engaged in a lawful act, i.e. was [he] lawfully armed, and not whether he actually acted in self-defense when the shooting occurred." *Id.* at 649 n. 6, 664 S.E.2d at 469 n. 6.

However, regardless of whether Jacques was lawfully armed in self-defense, the essence of involuntary manslaughter is the involuntary nature of the killing. *See Douglas v. State*, 332 S.C. 67, 74, 504 S.E.2d 307, 310 (1998) (finding no involuntary manslaughter charge warranted where defendant admitted he intentionally fired a gun into a crowd in self-defense despite testimony that the defendant had been rushed by a group of people during a fight); *State v. Pickens*, 320 S.C. 528, 466 S.E.2d 364 (1996) (holding where a defendant admitted he intentionally shot his gun, contending he was

---

3. The issue of instructing the jury on self-defense is not appealed.

4. The State makes a brief argument that Jacques was convicted of unlawful possession of a pistol by a person under twenty-one years of age and because of this he was "unlawfully armed." However, our supreme court has indicated section 16–23–30(c) of the South Carolina Code (2003), which outlawed possession of handguns by persons under the age of twenty-one, to be in violation of the plain language of South Carolina Constitution Article XVII, section 14. *See State v. Bolin*, 378 S.C. 96, 100, 662 S.E.2d 38, 40 (2008) (stating that with the exception of the General Assembly's ability to restrict the sale of alcohol to individuals until age twenty-one, every citizen who is eighteen years of age or older shall be deemed *sui juris* and be given all, and full, legal rights and responsibilities). It suffices that although a non-issue in this appeal, under the jurisprudence as it currently exists, Jacques's possession of the pistol is not unlawful *per se*, by virtue of his age.

acting recklessly but lawfully in self-defense, involuntary manslaughter charge was not warranted); *State v. Morris,* 307 S.C. 480, 483–84, 415 S.E.2d 819, 821–22 (Ct.App.1991) (noting that under involuntary manslaughter, the act must be unintentional and defendant intentionally shot his gun though he claimed self-defense); *accord Light,* 378 S.C. at 648–49, 664 S.E.2d at 468–69 (finding the defendant had lawfully armed himself in self defense and was entitled to an instruction on involuntary manslaughter, in a case in which there existed evidence the gun *unintentionally discharged* ); *Brayboy,* 387 S.C. at 181–82, 691 S.E.2d at 486 (holding that although unlawful to point and present a firearm, when a defendant lawfully armed himself in self defense his failure to immediately disarm himself when the threat subsided did not amount to unlawful pointing and presenting a firearm and evidence suggesting the gun *accidentally discharged* was sufficient to warrant instruction on involuntary manslaughter).

In this case, because by Jacques's own admission he voluntarily and intentionally fired his weapon, the trial court properly denied instructing the jury on involuntary manslaughter.

## CONCLUSION

For the aforementioned reasons, the rulings of the trial court are

**AFFIRMED.**

FEW, C.J., and PIEPER, J., concur.