THIS OPINION HAS NO
 PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY
 PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
 The State, Respondent,
 
 
 

v.

 
 
 
 Herman Donald McKnight, Appellant.
 
 
 

Appeal From Florence County
Thomas A. Russo, Circuit Court Judge

Unpublished Opinion No.  2011-UP-303  
 Submitted February 1, 2011  Filed June
17, 2011

AFFIRMED

 
 
 
 Deputy Chief Appellate Defender Robert M.
 Dudek, of Columbia, for Appellant.
 Attorney General Alan Wilson, Chief Deputy
 Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J.
 Zelenka, Assistant Attorney General Melody J. Brown, all of Columbia; and Solicitor
 Edgar L. Clements, III, of Florence, for Respondent.
 
 
 

PER CURIAM:  Herman McKnight appeals from his
 convictions for murder, assault and battery of a high and aggravated nature
 (ABHAN), discharging a firearm into a dwelling, and possession of a firearm
 during a crime of violence.  He argues the trial court erred in refusing to
 instruct the jury on involuntary manslaughter.  We affirm.[1]
FACTS
On August 22, 2007,
 after Donna Floyd's wake, McKnight and his family gathered at the home Donna
 had lived in with her mother, Alice.  Donna was McKnight's daughter, and when Alice
 was sick with cancer, McKnight testified he asked Donna to live with them.[2] 
 McKnight often stayed at the home, but he also owned his own trailer where he
 stayed on occasion.  Linda McKnight, McKnight's eldest daughter, testified that
 she, along with Donna and their younger sister, Kathy, owned the house.[3] 
 Linda was also living in the home at the time of the incident.  Additionally, Donna's
 son, Jay Floyd, lived in the home, and on occasion, Donna's husband,[4] Stewart Floyd, stayed there as well. 
McKnight wanted to
 drink a beer; however, Stewart objected to McKnight drinking in the home. 
 Sharon Floyd, a relative by marriage, testified McKnight said, "let's get the
 party going," meaning "he wanted to drink."  Sharon testified
 Stewart said, "I love you, . . . but we're not going to have that here
 tonight, tonight is not the night for that."  Jeanette Floyd, Stewart's
 mother, testified Stewart told McKnight, "I don't mean anything by this,
 but we don't feel up to any drinking and partying going on here tonight, and
 I'd like for you to leave."  Jeanette's husband, Lilton, said Stewart
 responded, "I don't mean no harm about it, I wish you . . . would go ahead
 and leave 'cause a wake is no place to be drinking."  Stewart angered
 McKnight by telling him what he could do in the home, so McKnight threatened
 Stewart and went to his vehicle to get his gun.  Sharon recalled that McKnight
 said he was going to get his gun and kill Stewart, and he went out the door. 
 Jeanette recollected that McKnight began cursing, looked at Stewart, pointed
 his finger, and said, "I'm going to kill your son of a bitching
 ass."  Lilton heard him say, "I'm gonna [sic] to kill you, you son of
 a bitch."  Donna's sister, Linda McKnight, testified she heard McKnight
 "threatened to blow [Stewart's] brains out" before running out the
 back door.  She feared McKnight was going to get a gun, so she went to the
 bathroom and called 911.  Mary Lee, the sister to a friend of McKnight's,
 testified she warned her brother, Joe Clark, to stop McKnight because she
 thought he was going to get a gun, and he appeared angry. 
When McKnight returned
 with the gun, someone had locked the first back door, but McKnight kicked it
 in.  Jeanette grabbed the doorknob to the second back door and told McKnight he
 could not come in the home.  She testified he replied, "the hell I
 won't" and "reared the gun back and he shot through the door,"
 hitting Jeanette's hand and arm.  Jeanette also heard Stewart cry out, and he
 "folded over . . . in his wheelchair."  She said she heard McKnight
 then say he was "going to kill the rest of these son of bitches." 
 Lilton testified when he got to the room, McKnight had shot Stewart and was
 standing over him "fixing to shoot him again."  Lilton's grandson,
 Ian Kinney, testified he saw McKnight "turn and stick the gun right at
 [Stewart's] side . . . [a]bout six to eight inches away," and shoot
 Stewart.  Another grandson of Lilton's, Nikki Kinney, testified he saw McKnight
 shoot Stewart.  Sharon and Linda testified they heard two gunshots, screaming,
 and chaos.  Lilton and Ian fought with McKnight to get the gun from him. 
 Stewart later died from his gunshot wounds. 
Deputy Rollins Rhodes
 was the first to respond to the 911 call for help, and he found Stewart laying
 on his right side with a hole in his left side.  He recovered the sawed-off
 shotgun, observed the broken chairs, broken glass, and blood, and noted
 Jeanette's injuries.  Rhonda Morris, a responding EMT, testified Stewart was
 not breathing when she arrived, and although she detected some electrical
 activity from his heart, his heart was not beating.  Dr. Susan Presnell, a
 forensic pathologist, testified Stewart died of a "close range shotgun
 wound . . . to his left side," and he also had wounds indicative of pellet
 marks hitting his body from further away.
In his defense,
 McKnight admitted he was angry and threatened Stewart; left the house to get
 his shotgun from his truck; kicked open one door and shot open another; entered
 the kitchen; pumped the shotgun; and took the gun over to Stewart.  However, he
 claimed he was not going to kill Stewart and simply wanted to scare him, but
 Stewart grabbed for the gun, causing it to discharge accidentally.  McKnight
 recalled Linda to the stand, and she testified McKnight and Stewart "got
 along well" and did not have any "problems or issues."  On
 cross-examination, however, she stated she was afraid McKnight was going to
 kill Stewart that night.
The Florence County Grand
 Jury indicted McKnight for murder, assault and battery with intent to kill
 (ABWIK), discharging a firearm into a dwelling, and possession of a firearm
 during a crime of violence.  A trial was held June 25 to 27, 2008.  The jury
 found McKnight guilty as charged, with the exception of McKnight's charge for
 ABWIK, for which the jury found him guilty of the lesser offense of ABHAN.  The
 court sentenced him to life imprisonment for murder, and concurrent sentences
 of ten years imprisonment for ABHAN and discharging a firearm into a dwelling.[5]  This appeal followed.
STANDARD OF REVIEW
 In criminal
 cases, the appellate court sits to review errors of law only and is bound by
 the trial court's factual findings unless they are clearly erroneous.  State
 v. Bryant, 372 S.C. 305, 312, 642 S.E.2d 582, 586 (2007).  Thus, on review,
 the appellate court is limited to determining whether the trial court abused its
 discretion.  Id.  An abuse of discretion occurs when the court's
 decision is unsupported by the evidence or controlled by an error of law.  State
 v. Garrett, 350 S.C. 613, 619, 567 S.E.2d 523, 526 (Ct. App. 2002).
LAW/ANALYSIS
McKnight argues the trial
 court erred in refusing to
 instruct the jury on involuntary manslaughter.  We disagree.
The trial court's duty is to
 give a requested instruction that correctly states the law applicable to the
 issues and is supported by the evidence.  State v. Lee-Grigg, 374 S.C.
 388, 405, 649 S.E.2d 41, 50 (Ct. App. 2007).  In determining whether the
 evidence requires a charge on involuntary manslaughter, this court must view
 the facts in the light most favorable to the defendant.  State v. Childers,
 373 S.C. 367, 373, 645 S.E.2d 233, 236 (2007).  "A request to charge a
 lesser included offense is properly refused only when there is no evidence that
 the defendant committed the lesser rather than the greater offense."  State
 v. Brayboy, 387 S.C. 174, 180, 691 S.E.2d 482, 485 (Ct. App. 2010).  The court's
 refusal to give a requested jury charge must be both erroneous and prejudicial
 to the defendant to warrant reversal.  Lee-Grigg, 374 S.C. at 415, 649
 S.E.2d at 55.
"Involuntary
 manslaughter is: (1) the unintentional killing of another without malice, but
 while engaged in an unlawful activity not amounting to a felony and not
 naturally tending to cause death or great bodily harm; or (2) the unintentional
 killing of another without malice, while engaged in a lawful activity with
 reckless disregard for the safety of others."  State v. Smith, 391 S.C.
 408, 414, 706 S.E.2d 12, 15 (2011).  "To constitute involuntary
 manslaughter, there must be a finding of criminal negligence, statutorily
 defined as a reckless disregard of the safety of others."  State v.
 Crosby, 355 S.C. 47, 52, 584 S.E.2d 110, 112 (2003).  "Recklessness is
 a state of mind in which the actor is aware of his or her conduct, yet
 consciously disregards a risk which his or her conduct is creating."  State
 v. Pittman, 373 S.C. 527, 571, 647 S.E.2d 144, 167 (2007).  "[A] person
 can be acting lawfully, even if he is in unlawful possession of a weapon, if he
 was entitled to arm himself in self-defense at the time of the shooting."  Crosby,
 355 S.C. at 52, 584 S.E.2d at 112.  "The negligent handling of a loaded
 gun will support a charge of involuntary manslaughter."  State v.
 Mekler, 379 S.C. 12, 15, 664 S.E.2d 477, 478 (2008).  "Additionally,
 evidence of a struggle over a weapon between a defendant and victim supports
 submission of an involuntary manslaughter charge."  Brayboy, 387 S.C.
 at 180, 691 S.E.2d at 485.
At the conclusion of the
 trial, McKnight requested charges on both voluntary and involuntary
 manslaughter.  McKnight argued he was entitled to the charge on involuntary
 manslaughter because there was evidence McKnight believed he had some ownership
 in the home and discharging a weapon in your home does not offend the statute
 against discharging a firearm into a dwelling,[6] there was evidence McKnight was reckless in his actions, and the struggle over
 the weapon supported the charge.  McKnight cited to Casey v. State, 305
 S.C. 445, 447, 409 S.E.2d 391, 392 (1991), in which the court held
 "[e]vidence of a struggle between a defendant and a victim over a weapon
 is sufficient for submission of an involuntary manslaughter instruction to the
 jury."  The State responded that McKnight was engaged in an unlawful act,
 the felony of pointing and presenting a firearm;[7] therefore, he was not entitled to a charge of involuntary manslaughter.  See State v. Reese, 370 S.C. 31, 36, 633 S.E.2d 898, 901 (2006), overruled
 on other grounds by State v. Belcher, 385 S.C. 597, 685 S.E.2d 802
 (2009) (noting it is a felony for a person to present or point at another
 person a loaded or unloaded firearm, and "there is no doubt that
 [appellant] was presenting a firearm when he took the gun out and began waiving
 [sic] it around. Therefore, [appellant] was pointing or presenting a firearm, a
 felony, which would preclude an involuntary manslaughter charge.").  The
 judge noted McKnight's request, but declined to charge involuntary
 manslaughter, instead charging voluntary manslaughter and accident.
On appeal, McKnight argues
 the court erred by refusing to charge the jury on involuntary manslaughter
 because there was evidence Stewart grabbed the gun, and it went off
 accidentally.  He asserts that evidence of a struggle over a gun is sufficient
 for the submission of an involuntary manslaughter instruction.  He also asserts
 there was evidence that his threat against Stewart was not taken seriously, and
 he only shot at the doorknob to open the locked door.  McKnight asserts he had
 a right to be in the house, he recklessly used the gun to shoot open the door,
 and he recklessly handled the gun so that it discharged when Stewart tried to
 grab the gun; therefore, he was entitled to an involuntary manslaughter charge.
McKnight cites to State v.
 Light, 378 S.C. 641, 664 S.E.2d 465 (2008), in support of his argument.[8]  In Light, the court found Light was entitled to an instruction on
 involuntary manslaughter despite "inconsistent stories" because there
 was evidence that Light was lawfully armed in self-defense at the time of the
 shooting.  378 S.C. at 648, 664 S.E.2d at 468-69.  Light testified he took the
 gun from his girlfriend who was threatening him, and because the gun discharged
 almost immediately after he took possession of it, the court found there was
 evidence he recklessly handled the gun.  Id. at 648, 664 S.E.2d at 469. 
 The Light court noted "the negligent handling of a loaded gun will
 support a finding of involuntary manslaughter" and "the fact
 petitioner and [the victim] were struggling over the weapon is sufficient
 evidence to support an involuntary manslaughter charge to the jury."  Id. at 648-49, 664 S.E.2d at 469.
In Crosby, 355 S.C. at
 52-53, 584 S.E.2d at 112, Crosby claimed he was trying to break up a fight when
 the decedent charged at him, so he removed a gun from his pocket in
 self-defense and pulled the trigger without realizing it.  Our supreme court
 determined Crosby was entitled to an involuntary manslaughter instruction
 because there was evidence from which the jury could infer that he did not
 intentionally shoot the gun.  Id. at 52-53, 584 S.E.2d at 112-13.  In Mekler,
 379 S.C. at 16, 664 S.E.2d at 479, Mekler was arguing with the decedent and pulled
 out her gun for self-defense.  As she was holding the gun, it discharged
 accidentally, hitting the decedent.  Id.  Our supreme court found she
 was entitled to an instruction on involuntary manslaughter because there was
 evidence she was reckless in the handling of the gun.  Id.  Also, in State
 v. Brayboy, this court found there was evidence the victim pulled out the
 gun, the defendant struggled with the victim to obtain the gun, and in the
 moments after the defendant obtained possession of the gun, the weapon
 discharged; thus, evidence existed from which the jury could determine Brayboy
 was lawfully armed in self-defense, and he negligently handled the loaded gun
 causing it to discharge.  387 S.C. at 182, 691 S.E.2d at 486.  Therefore, the
 court found evidence existed to support a charge on involuntary manslaughter.  Id. at 182, 691 S.E.2d at 487.
However, in State v.
 Brayboy, this court noted our supreme court's decision in Light "makes
 it clear the question is not whether one is acting in self-defense at the time
 of the shooting, but whether the defendant is lawfully armed at the time of the
 shooting."  Id.  Shortly after Brayboy, in State v. Gibson,
 this court determined the trial court had properly denied instructing the jury
 on involuntary manslaughter because, by the appellant's own admission, he had
 voluntarily and intentionally fired his weapon.  State v. Gibson, 390
 S.C. 347, 358, 701 S.E.2d 766, 772 (Ct. App. 2010).  The court stated that
 "regardless of whether [one is] lawfully armed in self-defense, the
 essence of involuntary manslaughter is the involuntary nature of the
 killing."  Id. at 357, 701 S.E.2d at 771.  
Similarly, in State v.
 Cabrera-Pena, 361 S.C. 372, 381, 605 S.E.2d 522, 526 (2004), the supreme
 court found Cabrera-Pena was not entitled to a charge on involuntary
 manslaughter because: 

 Cabrera-Pena's
 conduct  leaving Alma at Applebee's and purchasing a handgun; loading the
 handgun; returning to the Applebee's parking lot to wait for Alma to exit the
 restaurant; calling her over to his van after she exited the restaurant;
 showing Alma the gun and then walking her back over to the truck where the
 friends were standing, prompting Alma to motion to them that he had a gun; and
 finally, shooting her in the eye, killing her  is not the type of conduct
 contemplated under either definition of involuntary manslaughter.  

The
 court explained:

 Cabrera-Pena's
 conduct does not fit within the first definition of involuntary manslaughter
 because he was engaged in unlawful, felonious and harmful conduct.  At minimum,
 he used the loaded pistol to intimidate Alma and forcefully walk her over to
 the pickup truck where her friends were.  This conduct may be considered
 felonious under S.C. Code Ann. § 16-23-410 (1976) (pointing or presenting a
 firearm) . . . . Cabrera-Pena's conduct also does not fit within the penumbra
 of the second definition of involuntary manslaughter.  Cabrera-Pena was acting
 unlawfully when he took advantage of the unfair and extremely dangerous
 situation that he created by bringing a loaded, deadly weapon into a domestic
 dispute in a public place.  Moreover, this is not a type of involuntary
 manslaughter case where "a person can be acting lawfully, even if he is in
 unlawful possession of a weapon, if he was entitled to arm himself in self
 defense at the time of the shooting."  Cabrera-Pena presented no evidence
 that he was acting in self-defense.

Id. at 381-82, 605 S.E.2d at 526-27 (internal citations
 omitted).  Cabrera-Pena claimed Alma grabbed the gun from him, causing it to
 fire.  Id. at 375, 605 S.E.2d at 523.  The majority rejected the
 dissent's argument that mere evidence of negligent handling of a loaded gun will
 support a charge of involuntary manslaughter.  Id. at 382, 605 S.E.2d at
 527.  The court concluded:   

 It is
 patent that Cabrera-Pena's conduct in arming himself with a deadly weapon, to
 lay in wait for his wife, so that he could confront her, was not a lawful activity
 and, indeed, created a highly volatile and incendiary domestic situation that
 resulted in Alma's death.  Therefore, Cabrera-Pena was not entitled to an
 involuntary manslaughter charge.

Id. at 383-84, 605 S.E.2d at 528 (internal citation
 omitted).
Most recently, in Smith,
 391 S.C. at 414, 706 S.E.2d at 15, our supreme court determined Smith was not
 entitled to an instruction on involuntary manslaughter because "there is
 no evidence to suggest that Smith was without fault in bringing on the
 difficulty, that he believed or actually was in imminent danger of losing his
 life or sustaining serious bodily injury, or that he 'had no other probable
 means of avoiding the danger' other than drawing the loaded weapon."  
Viewing the evidence in the
 light most favorable to McKnight, we find the facts do not support a charge of involuntary
 manslaughter.  McKnight admitted he was angry; told Stewart he was going to
 kill him; exited the house; returned with a gun; kicked open one door and shot
 open another door; and aimed the gun at Stewart, who was wheelchair-bound. 
 McKnight was convicted of discharging a firearm into a dwelling, a felony, and he
 did not argue that pointing a gun at Stewart was a lawful act.  McKnight
 testified he believed Stewart was frightened and thought McKnight intended to
 kill him.  The forensic pathologist testified that in addition to dying from a
 close range shotgun wound to his left side, Stewart also had wounds indicative
 of pellet marks hitting his body from further away.  Jeanette testified she
 heard Stewart cry out when McKnight shot through the door.  Additionally, there
 was no evidence that McKnight was acting in self-defense or that he acted recklessly
 in his handling of the gun.  In fact, McKnight's testimony was that Stewart grabbed
 for the gun and caused it to fire.  Therefore, because by McKnight's own
 admission he voluntarily and intentionally fired his gun to shoot open the door
 and then aimed the gun at Stewart, we find the court did not err in denying
 McKnight's request to charge the jury on involuntary manslaughter.
CONCLUSION
Accordingly, the trial court's rulings are
AFFIRMED.
HUFF, SHORT
 and PIEPER, JJ., concur.

[1]  We decide this case without oral argument pursuant
 to Rule 215, SCACR.  
[2] Alice passed away before Donna, and Donna was still
 living in the home at the time of her own death.
[3]  Linda testified Alice owned the house, and when Alice
 died, she and her sisters inherited the house.
[4]  Although they were not legally divorced, Donna and
 Stewart no longer lived together as husband and wife, in part due to an
 accident that left Stewart partially paralyzed and wheelchair-bound.
[5]  The sentence for McKnight's remaining conviction for
 possession of a firearm during a crime of violence was subsumed in the sentence
 for murder pursuant to section 16-23-490(A) of the South Carolina Code, which
 provides: "This five-year sentence does not apply in cases where the death
 penalty or a life sentence without parole is imposed for the violent
 crime."  S.C. Code Ann. § 16-23-490(A) (2003).
[6]  Section 16-23-440(A) of the South Carolina Code
 provides:  "It is unlawful for a person to discharge or cause to be
 discharged unlawfully firearms at or into a dwelling house, other building,
 structure, or enclosure regularly occupied by persons.  A person who violates
 the provisions of this subsection is guilty of a felony and, upon conviction,
 must be fined not more than one thousand dollars or imprisoned not more than
 ten years, or both."  S.C. Code Ann. § 16-23-440(A) (2003).
[7]  We note that McKnight was charged with and found
 guilty of discharging a firearm into a dwelling, not pointing and presenting a
 firearm; however, we find this distinction to be inconsequential because both
 crimes are felonies.    Section 16-23-410 of the South Carolina Code provides:
 "It is unlawful for a person to present or point at another person a
 loaded or unloaded firearm.  A person who violates the provisions of this
 section is guilty of a felony and, upon conviction, must be fined in the
 discretion of the court or imprisoned not more than five years."  S.C.
 Code Ann. § 16-23-410 (2003).
[8] McKnight acknowledges that most involuntary
 manslaughter cases that involve a gun discharging arise in the context of
 criminal negligence while a person is allegedly acting in self-defense.  McKnight
 did not request a charge on self-defense.