# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Petitioner,

v.

Montrelle Lamont Campbell, Respondent.

Appellate Case No. 2022-000349

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Charleston County
Deadra L. Jefferson, Circuit Court Judge

---

Opinion No. 28219
Heard November 15, 2023 – Filed July 17, 2024

---

## REVERSED

---

Attorney General Alan McCrory Wilson, Deputy Attorney General Donald J. Zelenka, Senior Assistant Deputy Attorney General Melody Jane Brown, and Assistant Attorney General William Joseph Maye, all of Columbia; and Solicitor Scarlett Anne Wilson, of Charleston, for Petitioner.

Appellate Defender Lara Mary Caudy and Appellate Defender David Alexander, both of Columbia, for Respondent.

---

**JUSTICE JAMES:**  In 2018, Respondent Montrelle Campbell was convicted of one count of murder and two counts of attempted murder.  The issues before us concern (1) the trial court's instruction that malice aforethought may be inferred when the deed is done with a deadly weapon; (2) whether, under *State v. King*,[1] the State must prove expressed malice to obtain an attempted murder conviction; and (3) whether the trial court erred in giving an accomplice liability instruction.

The court of appeals reversed Campbell's convictions and remanded for a new trial.  Citing our decision in *State v. Burdette*, 427 S.C. 490, 832 S.E.2d 575 (2019), the court of appeals held the trial court's deadly weapon inferred malice instruction was error and held the error was not harmless.  *State v. Campbell*, 435 S.C. 528, 535-38, 868 S.E.2d 414, 418-19 (Ct. App. 2021).  The court also held our holding in *King* requires proof of expressed malice to sustain an attempted murder conviction.  *Id*. at 535, 868 S.E.2d at 418.  The court also held the trial court erred in giving an accomplice liability instruction.  *Id*. at 538-41, 868 S.E.2d at 419-21.

We reverse the court of appeals and hold (1) the trial court's erroneous instruction that malice may be inferred from the use of a deadly weapon was harmless, in light of the overwhelming evidence of malice in the record; (2) attempted murder can be proven by a showing of either expressed or implied malice, or both; and (3) there was sufficient circumstantial evidence in the record to support the accomplice liability instruction.

## I. Background

On Thursday, September 17, 2015, Katrina Brown was at her Charleston apartment in a complex named Gadsden Green with her sister Kerri Brown and friend Tonya Mosely when a woman named Kadeshia arrived around 11:30 p.m.  Kadeshia was an old friend of Kerri, and Katrina knew Kadeshia.  Campbell, Kadeshia's brother, eventually arrived at the apartment.

Katrina did not know Campbell was Kadeshia's brother and asked him to leave.  Campbell left without saying a word.  Katrina later walked outside to smoke a cigarette, and Campbell walked up to her and knocked her to the ground.  Campbell stood over Katrina and then walked to the middle of the street while Kerri and Tonya helped Katrina up.  The women then "had a few words" with Campbell, but when Katrina saw Campbell reaching for something inside a car, the women went back to

---

[1] 422 S.C. 47, 56, 810 S.E.2d 18, 22 (2017).

Katrina's apartment.

Katrina hosted a party at her apartment the next night. The party ended on Saturday morning around 6:30 a.m.—before sunrise—when someone fired fourteen rifle rounds into the apartment. At the time, approximately twelve people were present. Kerri was struck in the head, Katrina's cousin Tierra Brown in the arm, and Katrina's friend Antwan Frost in the chest. Kerri and Tierra survived, but Frost died. Police asked Katrina if she knew of anyone who wanted to harm her. Katrina told police she did not have a conflict with anyone in the neighborhood, but she told the police of her encounter with Campbell.

Police obtained security camera footage from multiple locations showing the area at the time of the shooting. Much of the footage was played for the jury. Detective Eric Tuttle was the lead detective and identified a gold Buick Century parking on Nunan Street in the footage. He identified Trivell Richardson and Andrew "Ace" Rivers as the individuals exiting the gold Buick, walking down Nunan Street, and turning left on President Street toward Gadsden Green. The footage shows Richardson in a white tee shirt and Rivers in black clothing walking in the direction of Gadsden Green. Neither was carrying a long gun. Within a few minutes, the footage shows Richardson walking back to the gold car, still not carrying a long gun. Moments later, the footage shows a third individual, identified by Richardson as Campbell, wearing a blue shirt, a t-shirt on his head, and carrying an AR-15 rifle. This individual was walking the same route Richardson took back to the gold Buick.

Detective Tuttle testified Richardson's and Campbell's cellphone records showed calls between Campbell's and Richardson's cellphones at 6:13 a.m. and 6:15 a.m., minutes prior to the shooting, in addition to numerous calls between them on the days before and after the shooting. Fourteen rounds of high-caliber rifle ammunition were fired into the apartment, and police found fourteen rifle shell casings in the grass outside Katrina's apartment. Thirteen casings were of one brand and one was of another brand. Police also recovered two cellphones on the ground next to the shell casings. No guns were recovered, no ballistics evidence was presented, and no information was extracted from the cellphones.

The investigation soon led police to Tomeka President, Campbell's relatively new girlfriend. President testified she resided in an apartment on Austin Avenue in North Charleston at the time of the shooting and that she and Campbell went to bed around 11:45 p.m., roughly seven hours before the shooting. President testified Campbell was gone when she woke up early the next morning, her gold Buick Century was not parked where she had left it, and her car keys were missing. She

called a taxi so she could get to work.  When she walked back out later when the taxi arrived, she saw her car parked in a different spot from where she had parked it.  The car was unlocked and the keys were on the front seat.  President testified the gold Buick Century in the video footage and still photos looked like hers.

Campbell was charged with the crimes about two weeks after the shooting. Richardson, who was also charged, testified during Campbell's trial that he left a North Charleston strip club around 4:00 a.m. the morning of the shooting.  A friend dropped Richardson off near his home on Austin Avenue, and Richardson was walking the remaining distance when he encountered Campbell.  Campbell asked Richardson if he would go with him to buy cigarettes, and they walked to a gold Buick Richardson recognized as Tomeka President's.  As Campbell drove, Richardson had his head down rolling a joint, so he did not notice at first that Campbell had gotten onto I-26 toward Charleston instead of going to a nearby Kangaroo convenience store.  Richardson testified he asked Campbell where he was going and that Campbell responded, "[J]ust chill.  It'll be all right."  Richardson testified Campbell parked President's car in a vacant lot at the corner of President Street and Kennedy Street, about one block away from Katrina's apartment. Richardson testified Campbell exited the vehicle and asked him to park the Buick on Nunan Street—about two blocks further away from Katrina's apartment—and wait.  Campbell began walking in the direction of Katrina's apartment building, and Richardson drove toward Nunan Street in the Buick.  He saw Ace Rivers walking on the street and asked him to ride with him.  Richardson parked on Nunan and began walking with Rivers toward President Street.  He testified he called Campbell so he could find him and give him the car keys so he—Richardson—could go home. As Richardson and Rivers were walking, Richardson heard at least five gunshots. Richardson testified he ran back to the Buick, and Rivers ran in the opposite direction.  While Richardson was trying to crank the car, Campbell got in with a rifle and said "go."  According to Richardson, the rifle "was smoking."  Richardson testified he drove back to North Charleston to where he first encountered Campbell, got out of the car, and walked home.  Richardson identified himself in video footage and still photos as the man in the white t-shirt wearing a Dallas Cowboys cap, Rivers as the man in dark clothing, and Campbell as the man in a blue shirt carrying a rifle. He also identified himself in still photos as the man in the white shirt parking the Buick on Nunan Street.

Campbell did not testify but presented testimony from Peggy Blake, who lived across the street from Katrina at the time of the shooting.  Blake's testimony is critical to the accomplice liability issue.  Blake testified she heard the gunshots, looked out a window, and saw a black man directly across the street in front of Katrina's

building wearing a gray hoodie and holding a "sporty rifle." She testified the man got into a lime green car and drove away. Detective Tuttle testified he did not see a lime green car in any of the camera footage. The video footage confirmed the gold Buick was parked several streets away, not in front of Katrina's apartment building.

Over Campbell's objections, the trial court instructed the jury that malice may be inferred from the use of a deadly weapon and instructed the jury on accomplice liability. The trial court also denied Campbell's request to charge the jury that attempted murder required proof of expressed malice.

## II. Discussion

"'Murder' is the killing of any person with malice aforethought, either express or implied." S.C. Code Ann. §16-3-10 (2015). "A person who, with intent to kill, attempts to kill another person with malice aforethought, either expressed or implied, commits the offense of attempted murder." S.C. Code Ann. §16-3-29 (2015). Our and the court of appeals' decisions refer to "implied malice" and "inferred malice" interchangeably. *See, e.g., Burdette*, 427 S.C. at 498, 832 S.E.2d at 580 (reviewing jury instruction that malice aforethought may be expressed or inferred); *State v. Taylor*, 434 S.C. 365, 367, 862 S.E.2d 924, 925 (Ct. App. 2021) (using both "implied" and "inferred").

The trial court correctly defined malice for the jury:

Malice is hatred, ill will, or hostility towards another person. It is the intentional doing of a wrongful act without just cause or excuse and with an intent to inflict an injury or under circumstances that the law will infer an evil intent.

The trial court correctly instructed the jury:

Malice aforethought may be expressed or inferred. These terms express[ed] or infer[red] do not mean different kinds of malice but merely the manner in which malice may be shown to exist . . . . Malice may be inferred from conduct showing a total disregard for human life.

However, the trial court included the following sentence after this instruction: "Inferred malice may also arise when the deed is done with a deadly weapon." At the time of Campbell's 2018 trial, that sentence was a proper instruction. However, in *Burdette*, we held such an instruction is an "improper court-sponsored emphasis of a fact in evidence" and "[r]egardless of the evidence presented at trial, trial courts shall not instruct a jury that the element of malice may be inferred when the deed is

done with a deadly weapon."  427 S.C. at 503-05, 832 S.E.2d at 582-83.

## A.  Malice Aforethought and Section 16-3-29

Citing *King*, the court of appeals held proof of expressed malice is required to sustain an attempted murder conviction.  *Campbell*, 435 S.C at 535-36, 868 S.E.2d at 418.  Citing the plain language of section 16-3-29, the State argues proof of either expressed or implied malice will sustain an attempted murder conviction.  We agree with the State.  Section 16-3-29 provides that "[a] person who, with intent to kill, attempts to kill another person with malice aforethought, either expressed or implied, commits the offense of attempted murder."  We cannot write the specific reference to implied malice out of the statute.  As the trial court instructed the jury, expressed malice and implied malice do not mean different kinds of malice, but rather the manner in which malice may be shown to exist.  It is settled law that whether malice is implied or expressed, "[t]he term, 'malice' conveys the meaning of hatred, ill-will, or hostility toward another . . . .  [M]alice has been frequently, substantially so defined as consisting of the intentional doing of a wrongful act toward another without legal justification or excuse."  *State v. Leach*, 282 S.C. 178, 180, 318 S.E.2d 267, 268 (1984) (quoting *State v. Heyward*, 197 S.C. 371, 15 S.E.2d 669, 671 (1941)).  The trial court's malice aforethought instruction was largely drawn from this language and was a correct statement of the law.  Simply put, the "malice aforethought" specified in section 16-3-29 can be proven by direct evidence, circumstantial evidence, or by a combination of the two.

## B. Inferred Malice and *Burdette*

As noted, the trial court instructed the jury that "[i]nferred malice may also arise when the deed is done with a deadly weapon."  In *State v. Belcher*, we held this instruction is error if evidence is presented that would "reduce, mitigate, excuse or justify the homicide."  385 S.C. 597, 611, 685 S.E.2d 802, 809 (2009).  There was no such evidence in this case, so the instruction was proper under *Belcher*.  However, while Campbell's appeal was pending in the court of appeals, we held in *Burdette* that the trial court must never instruct the jury that malice can be inferred from the use of a deadly weapon.  427 S.C. at 504-05, 832 S.E.2d at 583.  *Burdette* applies here because Campbell's appeal was pending when *Burdette* was decided and because Campbell preserved the issue.  *See id.* ("Our ruling today is effective in this case and in those cases which are pending on direct review or are not yet final, so long as the issue is preserved.").  The State concedes *Burdette* renders the instruction erroneous, but the State argues the error was harmless in light of the overwhelming evidence of malice in the record.  We agree with the State.

Erroneous jury instructions are subject to a harmless error analysis. "When considering whether an error with respect to a jury instruction was harmless, we must 'determine beyond a reasonable doubt that the error complained of did not contribute to the verdict.'" *State v. Middleton*, 407 S.C. 312, 317, 755 S.E.2d 432, 435 (2014) (quoting *State v. Kerr,* 330 S.C. 132, 144-45, 498 S.E.2d 212, 218 (Ct. App. 1998)). "In making a harmless error analysis, our inquiry is not what the verdict would have been had the jury been given the correct charge, but whether the erroneous charge contributed to the verdict rendered." *Id.* (quoting *Kerr*, 330 S.C. at 145, 498 S.E.2d at 218). It is a fact-intensive inquiry. *Id.* (citing *State v. Jeffries*, 316 S.C. 13, 22, 446 S.E.2d 427, 432 (1994) ("[W]e must review the facts the jury actually heard and weigh those facts against the erroneous jury charge to determine what effect, if any, it had on the verdict.")).

The court of appeals compared the evidence of malice in this case with that in *State v. Brooks*[2] and concluded "the evidence of express malice is significantly less than the amount in *Brooks*." *Campbell*, 435 S.C. at 538, 868 S.E.2d at 419. We note the court of appeals chose to compare only the evidence of expressed malice in the two cases; in any event, we conclude that even if *Brooks* is an appropriate measuring stick for overwhelming evidence of malice, the evidence of malice in the instant case rivals or surpasses that in *Brooks*. In *Brooks*, the defendant fired a pistol at two men in the parking lot of a nightclub. 428 S.C. at 624, 837 S.E.2d at 239. One man was killed, and the defendant was tried for murder. *Id.* As was the case here, the trial court instructed the jury that malice may be inferred if the deed is done with a deadly weapon. *Id.* And as here, the charge was error in light of *Burdette*. *Id.* at 626, 837 S.E.2d at 240. In *Brooks*, the court of appeals determined that "aside from any inference of malice the jury may have drawn from Appellant's use of a deadly weapon, the evidence of Appellant's other conduct satisfied the definition of malice." *Id.* at 630, 837 S.E.2d at 242. Specifically, the *Brooks* court noted that "[a]side from his mere use of a deadly weapon, [the defendant's] reckless behavior began with a hail of gunfire" at the two men. *Id.* at 631, 837 S.E.2d at 242. Other indicia of malice noted by the *Brooks* court were the defendant's pacing back and forth in the parking lot, taunting his victim, ignoring his victim putting his hands up, ignoring his friend's plea that he not shoot, displaying his guns, and—after firing—running to a nearby vehicle and fleeing the scene. *Id.* at 630-31, 837 S.E.2d at 242-43. The court also noted the defendant lied to police about his whereabouts and lied about cutting his hair after the murder. *Id.* at 631-32, 837 S.E.2d at 243. Here, the court of appeals omitted any reference to Campbell stealing Tomeka President's vehicle to facilitate his attack and gave short shrift to the indiscriminate firing of a rifle

_____

[2] 428 S.C. 618, 837 S.E.2d 236 (Ct. App. 2019).

fourteen times into an apartment where a party was going on, holding only that "Campbell's previous altercation with Katrina and Campbell driving across town is not a total disregard for human life like the defendant in *Brooks* displayed." *Campbell*, 435 S.C. at 538, 868 S.E.2d at 419.

Apart from the use of a deadly weapon, there is overwhelming evidence of malice in the record. We hold the erroneous inferred malice instruction did not contribute to the verdict. We therefore reverse the court of appeals on this issue.

## C. Accomplice Liability

Over Campbell's objection, the trial court instructed the jury:

[I]f a crime is committed by two or more people who are acting together and committing a crime, the act of one is the act of all. A person who joins with another to commit an unlawful act is criminally responsible for everything done by the other person which happens as a probable or natural consequence of the act done in carrying out the common plan and purpose . . . . If two or more people are acting together . . . assisting each other and committing the offense, the act of one is the act of all. Or it is sometimes said, the hand of one is the hand of all.

"If there is any evidence to warrant a jury instruction, a trial court must, upon request, give the instruction." *State v. Smith*, 391 S.C. 408, 412, 706 S.E.2d 12, 14 (2011) (citing *State v. Shuler*, 344 S.C. 604, 632, 545 S.E.2d 805, 819 (2001)). Accomplice liability can be proven by circumstantial evidence. "Under an accomplice liability theory, 'a person must personally commit the crime or be present at the scene of the crime and intentionally, or through a common design, aid, abet, or assist in the commission of that crime through some overt act.'" *State v. Condrey*, 349 S.C. 184, 194, 562 S.E.2d 320, 325 (Ct. App. 2002) (quoting *State v. Langley*, 334 S.C. 643, 648-49, 515 S.E.2d 98, 101 (1999)). "In order to establish the parties agreed to achieve an illegal purpose, thereby establishing presence by pre-arrangement, the State need not prove a formal expressed agreement, *but rather can prove the same by circumstantial evidence and the conduct of the parties*." *State v. Gibson*, 390 S.C. 347, 354, 701 S.E.2d 766, 770 (Ct. App. 2010) (emphasis added) (citing *Condrey,* 349 S.C. at 193, 562 S.E.2d at 324).

The court of appeals held that based on the evidence presented, only Richardson could have been Campbell's accomplice, citing testimony that Richardson rode with Campbell from North Charleston to a point near Katrina's apartment, parked the car for Campbell, and drove Campbell back to North

Charleston. *Campbell*, 435 S.C. at 540, 868 S.E.2d at 421. However, the court of appeals held there must also be evidence Richardson was the shooter for the accomplice liability instruction to be proper as to Campbell. *Id.* at 541, 868 S.E.2d at 421. The court concluded there was no evidence Richardson was a shooter, noting video footage showed Richardson without a rifle at the time of the shooting, wearing a white t-shirt and ball cap, not a gray hoodie, and driving a gold Buick blocks from the scene, not a lime green car parked at the scene. *Id.* We agree with the court of appeals that Richardson's involvement, whatever it may have been, did not warrant an accomplice liability instruction as to Campbell, because there was no evidence Richardson was a shooter.

We turn to the man Peggy Blake saw immediately after the shooting in front of Katrina's apartment building holding "a sporty rifle" and leaving the scene in a lime green car. The court of appeals held that while there was evidence the man seen by Blake was the shooter, there was no evidence Campbell and the man seen by Blake were accomplices. *Id.* at 540-41, 868 S.E.2d at 420-21. We agree with the court of appeals there is sufficient evidence in the record to allow the jury to conclude that man was a shooter. Indeed, Campbell undoubtedly elicited Blake's testimony in the hope her testimony would lead the jury to completely discount Campbell's involvement and conclude the man in the lime green car was the *sole* shooter. However, we cannot ignore Richardson's identification of Campbell as the man seen in the video footage wearing a blue shirt, carrying an AR-15 rifle, and walking the same path as Richardson from the direction of Katrina's apartment back to the gold Buick parked on Nunan Street. That footage was captured within moments of the time his own witness, Blake, saw the other man outside Katrina's apartment carrying a rifle and getting into a lime green car. While Campbell argued at trial Richardson made up his story to escape criminal liability, Richardson's account—right up to his testimony of the proverbial "smoking gun"—allowed the jury to conclude Campbell was also a shooter.

Keeping in mind that accomplice liability can be proven by circumstantial evidence, we reach the critical question—whether there is sufficient circumstantial evidence in the record to allow the jury to reasonably conclude Campbell and the man seen by Blake were accomplices. The State's argument on this point is compelling. The State argues "the remarkable fact that two different individuals [one of whom was Campbell] were seen fleeing the same crime while carrying rifles, at the precise moment following a massive shooting committed by rifle fire, is undeniable circumstantial evidence" of two people acting as accomplices, and "[t]o suggest the jury could not infer such a scenario … is to disregard the maxim that 'it is always for the jury to determine the facts and the inferences that are to be drawn

from those facts.'" *See Burdette*, 427 S.C. at 502, 832 S.E.2d at 582 (quoting *State v. Cheeks*, 401 S.C. 322, 328, 737 S.E.2d 480, 484 (2013)). We agree. We simply cannot ignore evidence of the arrival of two men outside the same apartment building at the same moment before dawn, both armed with rifles and firing into the same apartment. Had it not been for Blake's testimony, an accomplice liability instruction could well have been error. However, considering the evidence as a whole, the instruction was proper.

The court of appeals found that because there was evidence that Campbell was the shooter, the question—as in *State v. Washington*[3]—is whether the record contains "equivocal" evidence that the man seen by Blake was Campbell's accomplice. *Campbell*, 435 S.C. at 540, 868 S.E.2d at 420-21. In *Washington*, we held an accomplice liability instruction was improper under the facts of that particular case. 431 S.C. at 403, 410, 848 S.E.2d at 784, 787. We noted there was evidence the defendant was the shooter and that one Larry Kinloch was the only person who could have been his accomplice; however, there was no evidence Kinloch was armed. *Id*. at 409-11, 848 S.E.2d at 787-88. Therefore, we held the accomplice liability instruction was improper as to the defendant. *Id*. Our holding in *Washington*, as it must in every case in which accomplice liability is an issue, depended upon a review of the evidence presented. *Washington* does not create a template all other fact patterns must match in order for accomplice liability to be properly charged to the jury.

We hold the evidence in the record allowed the jury to reasonably conclude the man Blake saw holding a rifle and getting into the lime green car at the scene of the shooting at the exact time of the shooting was Campbell's accomplice. *See Gibson*, 390 S.C. at 354, 701 S.E.2d at 770 ("In order to establish the parties agreed to achieve an illegal purpose, thereby establishing presence by pre-arrangement, the State need not prove a formal expressed agreement, but rather can prove the same by circumstantial evidence and the conduct of the parties."). Therefore, we reverse the court of appeals and hold the trial court did not err in instructing the jury on accomplice liability.

## III. Conclusion

We reverse the court of appeals. The erroneous instruction that malice could be inferred from the use of a deadly weapon was harmless in light of the overwhelming evidence of malice separate and apart from the mere use of a deadly

---

[3] 431 S.C. 394, 406, 848 S.E.2d 779, 785 (2020).

weapon.  We hold proof of either expressed malice or implied malice will sustain an attempted murder conviction.  Malice aforethought can be proven by direct evidence, circumstantial evidence, or some combination of the two.  The trial court properly instructed the jury on accomplice liability because there is sufficient circumstantial evidence in the record that the man Peggy Blake saw holding a rifle and getting into the lime green car was both a shooter and Campbell's accomplice.

**REVERSED.**

**BEATTY, C.J., KITTREDGE, FEW, JJ., and Acting Justice Letitia H. Verdin, concur.**