691 S.E.2d 482

**The STATE, Respondent,**

v.

**John BRAYBOY, Appellant.**

No. 4652.

Court of Appeals of South Carolina.

Heard Feb. 2, 2010.
Decided March 4, 2010.
Rehearing Denied April 27, 2010.

Chief Appellate Defender Robert M. Dudek, South Carolina Commission on Indigent Defense Division of Appellate Defense, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attor-

ney General Donald J. Zelenka, and Senior Assistant Attorney General William Edgar Salter, III, Office of the Attorney General, of Columbia; Solicitor Harold W. Gowdy, III, of Spartanburg, for Respondent.

HUFF, J.

John Brayboy was convicted of murder in the death of his girlfriend and was sentenced to forty years. Brayboy appeals, asserting the trial court erred in failing to charge the jury on involuntary manslaughter. We reverse and remand.

## FACTUAL/PROCEDURAL BACKGROUND

Early in the morning on August 8, 2005, neighbors Towanda Means and her boyfriend, Roger Brewton, heard Brayboy and his live-in girlfriend, Simone Garrett, arguing in their home next door. Kenneth Holbert, who lived in the other side of a duplex shared with Brayboy and Simone, testified the arguing between Brayboy and Simone started as early as 4:00 or 5:00 the previous afternoon, continued until about midnight, and was heard again early that morning.

Towanda testified she was getting dressed for work that morning when she observed Simone on the front porch of the home she shared with Brayboy and Brayboy was four or five houses away at a stop sign. The two continued to argue back and forth. As Towanda was going back into her room to retrieve some shoes, she saw Brayboy walking back toward his home. Towanda continued to dress, and when she walked out of her door to go to work, she and Roger met Brayboy on their front porch. Brayboy asked to use the phone, and Towanda told him that she and Roger were not having "anything to do" with the argument, but they eventually provided Brayboy with a phone. At that point, Brayboy was nervous and upset, his hands were shaking, and he appeared to have been running. He fumbled with the phone trying to dial a number. Towanda asked Brayboy, "What did you do to her," and Brayboy replied, "Go check on my girl." Towanda, Roger, and Brayboy then went to Brayboy and Simone's home, where Towanda entered first, calling Simone's name. When Simone did not answer, Towanda continued through the

home, up the steps, and into a bedroom where she discovered Simone laying in a puddle of blood between a bed and a wall.

Roger also testified he witnessed Brayboy and Simone arguing that morning on their porch. The pair continued to argue while Simone was on the porch and Brayboy walked to the stop sign. Brayboy commented to Roger that "all she [Simone] want[ed] to do is put him [Brayboy] in jail," and Roger told Brayboy he was doing the right thing by walking away. Brayboy turned around when Simone called him "a crack head smoking M.F.," and he started back toward their house. Roger stepped back into his home and told Towanda that Simone and Brayboy were still arguing. Within a minute, Brayboy was at Towanda and Roger's home asking to use the phone. Brayboy was nervous and frantic and fumbled with the phone as he tried to dial it. Towanda asked Brayboy what he had done to Simone, and all Brayboy said was "go check on my girl." Towanda and Brayboy started toward the house. By the time Roger got there, Towanda was upstairs and Brayboy was coming back out of the house. Roger asked Brayboy what he had done. He then heard Towanda scream and Brayboy started running. Roger ran up the stairs and saw Simone lying between the bed and the wall. Simone subsequently died as a result of a gunshot wound to the head.

Brayboy did not testify at trial. However, the State published to the jury and entered into evidence Brayboy's videotaped statement given to a detective on the day of the incident. The State also entered into evidence Brayboy's written statement, which had been reduced to writing by the detective during the taping of Brayboy's statement. Brayboy told the detective about the two arguing that morning. According to Brayboy, when Simone was on the porch she yelled at him that it was her home and he needed to come get his things. Brayboy told Simone he paid rent too, and he started walking back to the house. Simone entered the house and he entered the house as well. According to Brayboy, he walked upstairs and the arguing continued. Brayboy stated that Simone was backing up on the left side of the bed, and she then bent down like she was reaching for something. Simone picked up a gun from the floor. As Simone was coming up with the gun, Brayboy realized what she had in her hand and he ran up to her and pushed her. When he did so, the gun fell

from Simone's hand to the floor between them and both Brayboy and Simone grabbed for it, with Brayboy successfully obtaining it. Brayboy explained that he and Simone were arguing and Simone was in his face. According to the written statement, Brayboy was "swinging the gun and Simone was in [his] face and the gun went off." In the video, Brayboy indicates that as he and Simone came up when he managed to grab the gun, Simone was in his face, swinging her arms and arguing, that Brayboy was also arguing, and the "next thing" Brayboy knew, as he was swinging his arms while he argued, the gun "just went off." Brayboy explained that Simone was "right in [his] face", that he "wasn't even thinking about the gun at the time, it was just in [his] hand" and that "[he] was just swinging and arguing and it just went off." Brayboy further stated in the video that he did not even remember the gun, and he was just swinging his arms and it went off.

At the close of the case, Brayboy requested the trial court charge the jury on accident and involuntary manslaughter. Brayboy asserted there was evidence in his statement that Simone pulled out the gun, they struggled over it, and he was able to obtain the gun and did so to defend himself. He therefore argued there was evidence from which the jury could find he was engaged in a lawful activity, but was negligent in the handling of the gun. The State opposed an instruction on involuntary manslaughter, arguing the case of *State v. Light,* 363 S.C. 325, 610 S.E.2d 504 (Ct.App.2005) (*Light I* ), *rev'd,* 378 S.C. 641, 664 S.E.2d 465 (2008), wherein this court affirmed the trial court's refusal to charge involuntary manslaughter in a similar matter, was on "all fours" with this case. The trial court agreed, and refused to charge involuntary manslaughter. The jury convicted Brayboy of murder, and this appeal follows.

## LAW/ANALYSIS

■ Appellant argues the trial court erred in refusing to instruct the jury on involuntary manslaughter, as his statement shows he and Simone struggled over the gun, he was swinging the gun around while Simone was "up in his face," and he was armed in self-defense when the gun went off. He contends there is evidence from which the jury could determine he was acting recklessly with the firearm when he swung

the gun, entitling him to a charge on involuntary manslaughter. Appellant further notes, at the time of briefing, certiorari had been granted on *Light I.* The State contends, while appellant claimed he was entitled to the involuntary manslaughter charge because he was armed in self-defense at the time of the shooting, he could not meet the necessary prongs of a self-defense charge, as it was clear Simone no longer posed a threat of death or serious bodily injury to appellant once appellant disarmed her. The State further contends, pursuant to *State v. Reese,* 370 S.C. 31, 633 S.E.2d 898 (2006), *overruled on other grounds by State v. Belcher,* 385 S.C. 597, 685 S.E.2d 802 (2009), it is a felony for a person to present or point at another person a loaded or unloaded firearm and, as in *Reese,* "there is no doubt that [appellant] was presenting a firearm when he took the gun out and began waiving it around. Therefore, [appellant] was pointing or presenting a firearm, a felony, which would preclude an involuntary manslaughter charge." *Id.* at 36, 633 S.E.2d at 900–01. Thus, the State contends Brayboy was clearly engaged in the felony of pointing and presenting a firearm. The State further argues, pursuant to this court's opinion in *Light I.* Brayboy failed to present any evidence he was acting in reckless disregard for Simone's safety.

The law to be charged must be determined from the evidence presented at trial. *State v. Knoten,* 347 S.C. 296, 302, 555 S.E.2d 391, 394 (2001). A trial court commits reversible error if it fails to give a requested charge on an issue raised by the evidence. *State v. Hill,* 315 S.C. 260, 262, 433 S.E.2d 848, 849 (1993). In determining whether the evidence requires a charge on a lesser included offense, the court views the facts in a light most favorable to the defendant. *See Knoten,* 347 S.C. at 302, 555 S.E.2d at 394 (providing a court must view the facts in the light most favorable to a defendant when determining whether evidence required a charge on the lesser included offense of voluntary manslaughter alongside the charge of murder). Importantly, our courts have long emphasized that to warrant a court's eliminating the offense of manslaughter, it should very clearly appear that there is *no evidence whatsoever* tending to reduce the crime from murder to manslaughter. *State v. Cole,* 338 S.C. 97, 101, 525 S.E.2d 511, 513 (2000); *State v. Burriss,* 334 S.C. 256, 265, 513 S.E.2d

104, 109 (1999); *Casey v. State*, 305 S.C. 445, 447, 409 S.E.2d 391, 392 (1991). A request to charge a lesser included offense is properly refused only when there is no evidence that the defendant committed the lesser rather than the greater offense. *Casey*, 305 S.C. at 447, 409 S.E.2d at 392.

▋ Involuntary manslaughter is (1) the unintentional killing of another without malice, but while engaged in an unlawful activity not naturally tending to cause death or great bodily harm or (2) the unintentional killing of another without malice, while engaged in a lawful activity with reckless disregard for the safety of others. *State v. Wharton*, 381 S.C. 209, 216, 672 S.E.2d 786, 789 (2009). "To constitute involuntary manslaughter, there must be a finding of criminal negligence, statutorily defined as a reckless disregard of the safety of others." *State v. Crosby*, 355 S.C. 47, 52, 584 S.E.2d 110, 112 (2003). "Recklessness is a state of mind in which the actor is aware of his or her conduct, yet consciously disregards a risk which his or her conduct is creating." *State v. Pittman*, 373 S.C. 527, 571, 647 S.E.2d 144, 167 (2007). "A person can be acting lawfully, even if he is in unlawful possession of a weapon, if he was entitled to arm himself in self-defense at the time of the shooting." *Crosby*, 355 S.C. at 52, 584 S.E.2d at 112. "The negligent handling of a loaded gun will support a charge of involuntary manslaughter." *State v. Mekler*, 379 S.C. 12, 15, 664 S.E.2d 477, 478 (2008). Additionally, evidence of a struggle over a weapon between a defendant and victim supports submission of an involuntary manslaughter charge. *Tisdale v. State*, 378 S.C. 122, 125, 662 S.E.2d 410, 412 (2008); *Casey*, 305 S.C. at 447, 409 S.E.2d at 392.

In *Light I*, this court found there was no evidence Light handled the gun with reckless disregard for the safety of others when he shot his girlfriend, and therefore the trial court properly refused to charge involuntary manslaughter. *Light I*, 363 S.C. at 331–32, 610 S.E.2d at 507–08. In July 2008, our supreme court reversed this court's decision in the matter. *State v. Light*, 378 S.C. 641, 664 S.E.2d 465 (2008) (*Light II* ). There, the supreme court noted the facts showed that Light initially gave a statement to Texas authorities stating he emerged from the bathroom in his home to find the victim holding his .22 rifle, he tried to distract the victim, he remembered swinging his left arm to get the rifle out of her

hand and when he did, the gun discharged. *Id.* at 644, 664 S.E.2d at 466. Light later altered his story, admitting he took the rifle from the victim before it was fired, the rifle was in his hand when it discharged, and "[i]t was either [the victim] or [him]." *Id.* At trial, Light testified the victim was pointing the gun and screaming at him, he was afraid she was going to shoot him, and so he tried to knock the gun away with his left hand. *Id.* at 645–46, 664 S.E.2d at 467. After he jerked it away from her, he stumbled back several feet and the weapon discharged, "but it was not intentionally [sic]." *Id.* at 645–46, 664 S.E.2d at 467. The supreme court then held as follows:

> Although petitioner had inconsistent stories, we find he was entitled to a charge of involuntary manslaughter.... The Court of Appeals correctly found petitioner was lawfully armed in self-defense at the time of the shooting because, according to his testimony, petitioner took the loaded gun from [the victim] who was threatening him with it. There was also evidence petitioner recklessly handled the gun because, according to his testimony, it fired almost immediately after he took possession of it. As specifically stated in *Burriss*, the negligent handling of a loaded gun will support a finding of involuntary manslaughter. Further, the fact petitioner and [the victim] were struggling over the weapon is sufficient evidence to support an involuntary manslaughter charge to the jury. Accordingly, there was evidence to support a charge of involuntary manslaughter and, therefore, the trial court should have so charged the jury.

*Id.* at 648–49, 664 S.E.2d at 468–69 (citations deleted). In a footnote to this holding, the court also noted there is a difference between being armed in self-defense and acting in self-defense, and that at the point of the analysis of determining whether one is armed in self-defense, the court is "concerned only with whether [the defendant] had a right to be armed for purposes of determining whether he was engaged in a lawful act, i.e. was lawfully armed, and not whether he actually acted in self-defense when the shooting occurred." *Id.* at 648 n. 6, 664 S.E.2d at 468 n. 6.

Here, considering the evidence in the light most favorable to Brayboy, we find there is evidence to support a charge on involuntary manslaughter such that the trial court erred in failing to so charge the jury. According to Brayboy's state-

ment, Simone pulled the gun on Brayboy, Brayboy pushed Simone causing the gun to fall to the ground, the two both grabbed for the gun, Brayboy reached the gun first, they were both arguing and swinging their arms, and Simone was "up in [Brayboy's] face" when the gun discharged shortly after Brayboy grabbed the gun. There is evidence from the videotaped statement that the gun discharged when Brayboy swung his arm around, right after he picked it up, and he did not "even remember the gun" at the time. *See Crosby,* 355 S.C. at 53, 584 S.E.2d at 112 (finding involuntary manslaughter charge should have been given where defendant admitted he closed his eyes and pulled the trigger, but added that **"he didn't even know he had pulled the trigger."**) (emphasis in original). As in *Light II,* there is evidence the victim pulled out a gun, the defendant struggled with the victim to obtain the gun, and in the moments right after the defendant obtained possession of the gun, the weapon discharged. Accordingly, there is evidence from which the jury could determine Brayboy was lawfully armed in self-defense, and he negligently handled the loaded gun causing it to discharge.

There is no merit to the State's argument that Brayboy was not entitled to an involuntary manslaughter charge because he could not meet the necessary prongs of a self-defense charge. The supreme court's decision in *Light II* makes it clear the question is not whether one is **acting** in self–defense at the time of the shooting, but whether the defendant is **lawfully armed** at the time of the shooting. Therefore, whether a defendant is entitled to a self-defense charge is of no consequence. Additionally, the case of *Reese,* relied on by the State, is not controlling in this situation. In *Reese,* the defendant gave a statement to police admitting he shot the victim, but stated he did not go to her house with the intent to kill her. Rather, he was upset and crying and pulled the gun out and told the victim he was going to kill himself. While the victim was attempting to talk him out of killing himself, Reese claimed he was "moving the gun back and forth as a reaction" and the gun fired. *Reese,* 370 S.C. at 35, 633 S.E.2d at 900. Thus, the court found, "Although the jury could have found Reese's statement that he was moving the gun back and forth did not constitute pointing a firearm, and threatening suicide has not been classified as an unlawful act, there is no doubt

that Reese was *presenting* a firearm when he took the gun out and began waiving it around." *Id.* at 36, 633 S.E.2d at 901 (emphasis in original). Because the defendant in *Reese* produced the gun with which the victim was shot, he necessarily "presented" the firearm, an unlawful act. Here, as in *Light II.* the defendant did not "present" the gun. Therefore *Reese* is inapplicable.

## CONCLUSION

We find, under the facts of this case, there is evidence from which the jury could determine Brayboy was lawfully armed in self-defense and negligently handled the loaded gun causing it to discharge, and he was therefore entitled to a charge on involuntary manslaughter. Accordingly, Appellant's murder conviction is

**REVERSED AND REMANDED.**

THOMAS and KONDUROS, JJ., concur.