**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(D)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Brandon Heath Clark, Petitioner,

v.

State of South Carolina, Respondent.

Appellate Case No. 2015-001898

_____

**ON WRIT OF CERTIORARI**

_____

Appeal From Greenville County
Perry H. Gravely, Circuit Court Judge

_____

Unpublished Opinion No. 2019-UP-394
Submitted September 12, 2019 – Filed December 18, 2019

_____

**AFFIRMED**

_____

Appellate Defender Kathrine Haggard Hudgins, of Columbia, for Petitioner.

Senior Assistant Deputy Attorney General Megan Harrigan Jameson, of Columbia, for Respondent.

_____

**PER CURIAM:**  In this appeal from the denial of an application for post-conviction relief (PCR), Brandon Heath Clark argues the PCR court erred in refusing to find trial counsel ineffective for not (1) calling two witnesses to impeach testimony about alleged conversations two other witnesses said they had with Clark after a shooting, and (2) objecting to the trial court's instruction to the jury that inferred malice may also arise when the deed is done with a deadly weapon when there was evidence in the record that would reduce Clark's charge from murder to involuntary manslaughter.  We affirm.

**FACTS**

On July 29, 2006, a crowd[1] gathered at a party to watch a fight between Cameron Wade and Joshua Wood.  Wood and Wade had fought two weeks earlier.  Wood arrived at the party with David Murray.  Wade arrived at the party in a car with Christopher Garland.  Clark went to the party with Christopher Allison (Christopher) and Jordan Mardis.[2]  Although the trial testimony conflicts as to what occurred at the party, it is undisputed that Wade and Garland were fatally shot while they sat in a car at the party.  Additionally, at trial, Clark and the State stipulated that (1) Clark went to the party, (2) he fired his pistol nine times during the party, and (3) the nine .40 caliber shell casings found at the scene came from his gun.

At Clark's trial, Wood admitted he was drinking and acting wild and out of control at the party.  Wood further admitted he intended to fight Wade at the party.  He testified when the victims arrived at the party, he hit one of the people who arrived with them with a stick.  Wood stated after he hit the person with a stick, he heard gunshots coming from behind him and from the road, and he claimed he saw Clark shoot into the air twice.  Wood testified that after the gunshots, he ran towards Murray's car but did not leave the scene immediately.  Instead, he and Murray stopped to pick up a friend, who had been left behind at the party by Clark, Christopher, and Mardis.  Wood stated he threw a tire iron from Murray's car at another car because he thought it belonged to the person he hit with a stick, and he kicked in the car's rear window.  Wood testified he did not know the victims were in the car, and he left after kicking in the window.  Wood stated that after leaving the party, he and Murray went to the home of Kayte and Dustin Allison (the

---

[1] Witnesses testified and law enforcement was told there were between twenty and two hundred people at the party.
[2] At trial, Jordan's last name was spelled Mardis.  However, at the PCR hearing, his last name was spelled Martis.

Allisons).  Wood stated Clark was at the Allisons' home when they arrived, and Clark told Wood, "I think I shot them, I think I shot them."  Wood claimed he told Clark, "[N]o, you didn't, you didn't shoot them, you shot into the air."  Wood asserted Clark had a gun in his hands when they spoke, and Clark "said something about throwing it in the river."  Wood testified he did not have a gun the night of the party.  On cross-examination, Wood admitted he had blood on his leg when he arrived at the Allisons' home.

Murray testified he went to the party with Wood, knowing Wood intended to fight Wade.  Murray stated Wood did not have a gun at the party.  Murray described hearing gunshots, but he did not see who fired the gun.  After the shots were fired, Murray testified he told Wood "let's go," and they left the scene; however, they turned back because Wood thought he saw some of their friends.  Murray explained when they went back for their friends, Wood got out of the truck and threw a tire iron at another car.  Murray stated he did not see Wood kick in the car window.  Murray stated he and Wood then went to the Allisons' home, and Clark was there when they arrived.  Murray did not see Clark with a gun at the Allisons' home, but he stated Clark told Christopher that Christopher "was supposed to throw the gun in the river."  Murray did not hear Clark say he shot the victims, and Murray stated "we thought [Clark] had shot in the air."  On cross-examination, Murray stated he did not know if it was his tire iron that Wood threw at the car, and he testified Wood was not bleeding when they left the party.

Christopher testified he went to the party with Clark and Mardis.  Christopher stated he saw someone shoot a gun over the hood of a Honda, and in response, Clark fired his .40 caliber Smith and Wesson gun approximately nine times into the air.  Christopher stated that after the shots, Clark drove him and Mardis to the Allisons' home.[3]  Christopher asserted he did not see anyone else with a gun that night.

On cross-examination, Christopher repeated his assertions that he saw Clark fire his gun into the air nine times, and they left after Clark fired the gun.  Christopher also recalled seeing Wood run up to the back side of a car with a large item that could have been a tire iron.  Christopher stated he did not see Wood throw the item at the car.  Christopher stated Wood arrived at the Allisons' home about thirty minutes after he and Clark did.  Christopher explained Wood's leg was bleeding when he arrived, and Kayte would not let Wood into the house because she had a

---

[3] Christopher and Dustin are brothers.

young son who crawled, and she did not want blood on the floor. Christopher stated Murray did not come into the house and talk with Clark that night.

Both victims died from a single gunshot wound. Nine .40 caliber shell casings were found ten to twelve yards from the victims' vehicle, and the forensic firearms examiner stated each of the casings were fired from the same firearm. The forensic firearms examiner admitted he could not determine if the casings were fired from the same gun that fired the bullet retrieved from one of the victim's bodies because there was no firearm for comparison. However, the forensic firearms examiner did state the ballistic evidence showed the bullet retrieved from one of the victim's bodies was consistent with being fired from a .40 caliber Smith and Wesson, the same type of gun that fired the casings. Clark's gun was never recovered.

In March 2007, a Greenville County grand jury indicted Clark for two counts of murder and two counts of possession of a weapon during the commission of a violent crime. Clark proceeded to trial on the charges, and the jury found him guilty as charged. The trial court sentenced Clark to concurrent terms of forty years' imprisonment for each count of murder and five years' imprisonment for each count of possession of a weapon during the commission of a violent crime.

Clark appealed, and this court affirmed his convictions and sentences. *See State v. Clark*, Op. No. 2012-UP-549 (S.C. Ct. App. filed Oct. 10, 2012). Clark filed an application for PCR, which the PCR court denied. Clark then filed a petition for a writ of certiorari with this court on April 6, 2016. On June 22, 2018, this court granted Clark's petition for a writ of certiorari. This appeal follows.

**STANDARD OF REVIEW**

"Our standard of review in PCR cases depends on the specific issue before us. We defer to a PCR court's findings of fact and will uphold them if there is evidence in the record to support them." *Smalls v. State*, 422 S.C. 174, 180, 810 S.E.2d 836, 839 (2018), *reh'g denied* (Mar. 29, 2018) (citing *Sellner v. State*, 416 S.C. 606, 610, 787 S.E.2d 525, 527 (2016), and *Jordan v. State*, 406 S.C. 443, 448, 752 S.E.2d 538, 540 (2013)). "We review questions of law de novo, with no deference to trial courts." *Id.* at 180-81, 810 S.E.2d at 839-40 (citing *Sellner*, 416 S.C. at 610, 787 S.E.2d at 527, and *Jamison v. State*, 410 S.C. 456, 465, 765 S.E.2d 123, 127 (2014)). "[W]e will reverse the PCR court's decision when it is controlled by an error of law." *Sellner*, 416 S.C. at 610, 787 S.E.2d at 527.

# LAW/ANALYSIS

## I.      Witnesses

Clark argues the PCR court erred in refusing to find trial counsel ineffective for not calling the Allisons to impeach testimony about alleged conversations Wood and Murray said they had with Clark after the shooting. We disagree.

"A criminal defendant is guaranteed the right to effective assistance of counsel under the Sixth Amendment to the United States Constitution." *Taylor v. State*, 404 S.C. 350, 359, 745 S.E.2d 97, 101 (2013). "[T]o establish a claim for ineffective assistance of counsel, the applicant must show that: (1) counsel failed to render reasonably effective assistance under prevailing professional norms, and (2) counsel's deficient performance prejudiced the applicant's case." *Speaks v. State*, 377 S.C. 396, 399, 660 S.E.2d 512, 514 (2008). Deficiency "is measured by an objective standard of reasonableness." *Taylor*, 404 S.C. at 359, 745 S.E.2d at 102. To establish prejudice, an applicant must show that "but for counsel's error, there is a reasonable probability the result of the proceedings would have been different." *Id.* "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

"[A] PCR applicant must produce the testimony of a favorable witness or otherwise offer the testimony in accordance with the rules of evidence at the PCR hearing in order to establish prejudice from the witness' failure to testify at trial." *Bannister v. State*, 333 S.C. 298, 303, 509 S.E.2d 807, 809 (1998). "The applicant's mere speculation [as to] what the witnesses' testimony would have been cannot, by itself, satisfy the applicant's burden of showing prejudice." *Glover v. State*, 318 S.C. 496, 499, 458 S.E.2d 538, 540 (1995).

"In post-conviction proceedings, the burden of proof is on the applicant to prove the allegations in his application." *Speaks*, 377 S.C. at 399, 660 S.E.2d at 514. "Counsel's performance is accorded a favorable presumption, and a reviewing court proceeds from the rebuttable presumption that counsel 'rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Smith v. State*, 386 S.C. 562, 567, 689 S.E.2d 629, 632 (2010) (quoting *Strickland*, 466 U.S. at 690). "Accordingly, when counsel articulates a valid reason for employing a certain strategy, such conduct will not be deemed ineffective assistance of counsel." *Id.* "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to

evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Id.* at 691.

Clark argues the PCR court erred by not finding trial counsel ineffective for failing to call the Allisons as witnesses to impeach the testimony of Wood and Murray about alleged conversations they had with Clark after the shooting. Clark contends this prejudiced him because the Allisons' testimony was critical to refute Wood's testimony that Clark said he thought he shot the victims. Clark further asserts it prejudiced him because Wood and Murray both stated Clark discussed disposing of his gun in the river.

At the PCR hearing, trial counsel testified he issued several subpoenas in this case, but he did not have a subpoena for the Allisons. Trial counsel further stated he did not have any notes about interviews with the Allisons in his records. Trial counsel claimed he did not have any witnesses that corroborated Christopher's testimony, and he "guessed" at the time of trial he did not believe "it would have been helpful to present evidence that would have corroborated [Christopher's] testimony." Trial counsel stated he decided to not put up a defense despite the fact that he subpoenaed several witnesses because "[he] believed that the State had not proved their case beyond a reasonable doubt to the jury. [He] believe[d] that based on . . . the conflicting testimony that came out." In particular, trial counsel said the State could not prove Clark's gun fired the bullets that killed the victims; however, he admitted the State's expert testified the victims were shot with .40 caliber bullets, the same caliber as Clark's gun. Trial counsel initially insisted the State could not prove what caliber bullets killed the victims, but after reviewing the trial transcript several times, trial counsel admitted the State's expert testified as to the bullets' caliber. Trial counsel additionally admitted he argued to the trial court that the State could not determine what type of bullet killed the victims. Trial counsel also explained he raised a third-party guilt defense, arguing Wood and Murray actually killed the victims, not Clark.

Kayte, Clark's cousin, testified Clark, Christopher, and Mardis all came to her home after the party, and about forty-five minutes later, Wood and Murray arrived at her home. Kayte testified Murray waited in the car while Wood came to her door, but she would not let him inside because he had blood on his legs and she did not want to get blood on her floor where her young son crawled. She stated neither Wood nor Murray came into her house, and to her knowledge, Clark never went outside to speak with Wood and Murray. Wood and Murray left her home, and Clark stayed at her home for the entire evening. She said Clark did not have a

weapon at her home. She also asserted she met with trial counsel about Clark's case and went with Clark every time he met trial counsel at his office. Kayte testified she told trial counsel her story, and trial counsel subpoenaed her for Clark's trial. She attended Clark's trial, but trial counsel did not call her to testify.

Dustin testified Clark and Christopher came to his and Kayte's home after the party, and after thirty or forty-five minutes, Wood and Murray also arrived at the Allisons' home. Dustin stated he did not see Clark with a weapon. He and Kayte did not let Wood into their home because he was bloody from a cut on his leg. He also asserted Murray sat on the front porch of the Allisons' home but never came into the home. Dustin said to his knowledge, Clark never spoke with Wood or Murray because Clark was upstairs with the Allisons' son. He and Kayte gave Wood paper towels to clean up his leg, and after that, Wood and Murray left without ever entering their home. Dustin stated Wood said he kicked in a car window and the victims were still alive when he did it. Dustin met with trial counsel three or four times, and he had the opportunity to tell trial counsel his story. Trial counsel subpoenaed Dustin to testify, but he did not testify at trial.

Clark testified he asked trial counsel to contact and interview the Allisons, and they met trial counsel with Clark a few times. Clark stated the Allisons were able to tell trial counsel what they saw and heard that night, and trial counsel subpoenaed them for trial. Clark and trial counsel discussed trial counsel's decision to not put any witnesses on the stand, but Clark could not remember why he made that decision. Clark thought the Allisons' testimony "could have disputed what [Wood] said . . . and could have helped [him] out."

On cross-examination, Clark admitted Wood and Christopher both testified that Wood's leg was bloody, but he asserted this fact "wasn't what [he] was talking about [on direct]." Instead, Clark stated he referred to Wood's statement that Clark told him, "I think I killed those two men." Clark contended the Allisons' testimony would have affected the outcome of his trial because their testimony "[w]ould have disputed what . . . a main witness said." Clark admitted trial counsel "[got] a lot of the State's witnesses to admit inconsistencies," but he believed it would have been better if the Allisons had testified.

The PCR court found Clark did not meet his burden of proof to show "trial counsel should have called witnesses to testify at trial." In particular, the PCR court found the Allisons' testimony would not have changed the outcome of the trial because (1) their statements that Clark did not have a gun at their home were irrelevant in light of Clark's stipulation that he fired a gun during the party; (2) their testimony

that Wood's leg was bloody would have been cumulative to Wood's and Christopher's testimony; and (3) the Allisons' testimony differed on whether Murray stayed in his truck or came to the Allisons' front porch. Thus, the PCR court found trial counsel's representation did not prejudice Clark.

We find probative evidence supports the PCR court's finding that trial counsel did not act ineffectively when he made the decision not to call the Allisons as witnesses at Clark's trial. *See Sellner*, 416 S.C. at 610, 787 S.E.2d at 527 ("This [c]ourt gives great deference to the factual findings of the PCR court and will uphold them if there is any evidence of probative value to support them."); *Bannister*, 333 S.C. at 303, 509 S.E.2d at 809 ("[A] PCR applicant must produce the testimony of a favorable witness or otherwise offer the testimony in accordance with the rules of evidence at the PCR hearing in order to establish prejudice from the witness' failure to testify at trial."). Although trial counsel subpoenaed several witnesses,[4] he stated he decided to not put up a defense because he thought the State had not proven Clark's guilt beyond a reasonable doubt, explaining the State could not prove the bullets that killed the victims came from Clark's gun. *See Smith*, 386 S.C. at 567, 689 S.E.2d at 632 ("[W]hen counsel articulates a valid reason for employing a certain strategy, such conduct will not be deemed ineffective assistance of counsel."). Further, the PCR court correctly found the Allisons' testimony would not have changed the outcome of the trial. Therefore, we find trial counsel was not ineffective by not calling the Allisons as witnesses.

Furthermore, trial counsel's decision not to call the Allisons as witnesses did not prejudice Clark. *See Taylor*, 404 S.C. at 359, 745 S.E.2d at 102 (stating to establish prejudice, an applicant must show that "but for counsel's error, there is a reasonable probability the result of the proceedings would have been different"); *id.* ("A reasonable probability is a probability sufficient to undermine confidence in the outcome." (quoting *Strickland*, 466 U.S. at 694)). Clark produced the testimony of Kayte and Dustin at the PCR hearing. Kayte and Dustin both testified Clark came to their home after the party, and Wood and Murray arrived at their home thirty to forty-five minutes after Clark. They also testified Kayte would not let Wood inside the home because his leg was bleeding. Additionally, they testified Wood and Murray never came into their home, and to their knowledge, Clark never went outside their home or spoke to Wood or Murray. Therefore, the Allisons' testimony would not have refuted Wood's and Murray's testimony about

---

[4] At the PCR hearing, trial counsel stated he had no recollection of subpoenaing the Allisons; however, both Kayte and Dustin testified trial counsel subpoenaed them but did not call them at trial.

alleged conversations they had with Clark after the shooting. Furthermore, the Allisons could have been impeached regarding their differing testimony about whether Murray remained in his truck or came to the Allisons' front porch. Because the Allisons' testimony would have been cumulative and impeachable, we find trial counsel's decision not to call the Allisons as witnesses did not prejudice Clark.

## II.     Jury Instruction

Clark argues the PCR court erred in declining to find trial counsel ineffective for not objecting to the trial court's instruction to the jury that inferred malice may also arise when the deed is done with a deadly weapon when there was evidence in the record that would reduce the charge from murder to involuntary manslaughter. We disagree.

"The trial court is required to charge only the current and correct law of South Carolina." *State v. Mattison*, 388 S.C. 469, 479, 697 S.E.2d 578, 583 (2010). "The law to be charged to the jury is to be determined by the evidence presented at trial." *State v. Lee*, 298 S.C. 362, 364, 380 S.E.2d 834, 835 (1989). "The trial [court] should charge only the law applicable to the case as the purpose of jury instructions is to enlighten the jury." *Id.* at 364, 380 S.E.2d at 836 (internal citations omitted). "Providing instructions to the jury which do not fit the facts of the case may tend to confuse the jury." *Id.* "To warrant reversal, a trial [court]'s refusal to give a requested jury charge must be both erroneous and prejudicial to the defendant." *State v. Brown*, 362 S.C. 258, 261, 607 S.E.2d 93, 95 (Ct. App. 2004).

In *State v. Belcher*, our supreme court held:

> [W]here evidence is presented that would reduce, mitigate, excuse[,] or justify a homicide (or assault and battery with intent to kill) caused by the use of a deadly weapon, juries shall not be charged that malice may be inferred from the use of a deadly weapon. The permissive inference charge concerning the use of a deadly weapon remains a correct statement of the law where the only issue presented to the jury is whether the defendant has committed murder (or assault and battery with intent to kill).

385 S.C. 597, 612, 685 S.E.2d 802, 810 (2009), *overruled by State v. Burdette*, 427 S.C. 490, 832 S.E.2d 575 (2019), *reh'g denied* (Sept. 27, 2019). However, recently, in *Burdette*, 427 S.C. at 504-05, 832 S.E.2d at 583, our supreme court held, "[r]egardless of the evidence presented at trial, trial courts shall not instruct a jury that the element of malice may be inferred when the deed is done with a deadly weapon."

"Involuntary manslaughter is defined as (1) the unintentional killing of another without malice but while engaged in an unlawful activity not naturally tending to cause death or great bodily harm; or (2) the unintentional killing of another without malice but while engaged in a lawful activity with reckless disregard for the safety of others." *State v. Mekler*, 379 S.C. 12, 15, 664 S.E.2d 477, 478-79 (2008). "The negligent handling of a loaded gun will support a charge of involuntary manslaughter." *Id*. "A trial court should refuse to charge the lesser-included offense of involuntary manslaughter only where there is no evidence the defendant committed the lesser offense." *Id*.

"[T]here is a difference between being armed in self-defense and acting in self-defense, and that at the point of the analysis of determining whether one is armed in self-defense, the court is 'concerned only with whether [the defendant] had a right to be armed for purposes of determining whether he was engaged in a lawful act, i.e., was lawfully armed, and not whether he actually acted in self-defense when the shooting occurred.'" *State v. Brayboy*, 387 S.C. 174, 181, 691 S.E.2d 482, 486 (Ct. App. 2010) (quoting *State v. Light*, 378 S.C. 641, 648 n.6, 664 S.E.2d 465, 468 n.6 (2008) (*Light II*)). Our supreme court has stated "'[t]here is no error in the refusal to charge the law of involuntary manslaughter when the defendant admitted intentionally firing the gun, but claimed only he meant to shoot over the victim's head.'" *Harris v. State*, 354 S.C. 382, 389, 581 S.E.2d 154, 157 (2003) (quoting *State v. Cooney*, 320 S.C. 107, 112, 463 S.E.2d 597, 600 (1995)). Also, in *Bozeman v. State*, 307 S.C. 172, 177, 414 S.E.2d 144, 147 (1992), the petitioner stated he never aimed the pistol, but he did intend to shoot the gun. Our supreme court held trial counsel's failure to request a jury charge of involuntary manslaughter was not deficient performance because the evidence in the record did not support a charge of involuntary manslaughter. *Id*. The court found there was no evidence to support an allegation of mere criminal negligence in the use of a dangerous instrumentality. *Id*.; *see State v. Pickens*, 320 S.C. 528, 531, 466 S.E.2d 364, 366 (1996) (finding refusal to charge involuntary manslaughter is proper when a defendant admits he intentionally shot the gun at the victim); *State v. Smith*, 315 S.C. 547, 550, 446 S.E.2d 411, 413 (1994) (finding defendant acted intentionally in wielding knife, and stabbing is an unlawful act; thus, defendant

was not entitled to a charge on involuntary manslaughter); *Sullivan v. State*, 407 S.C. 241, 245, 754 S.E.2d 885, 887 (Ct. App. 2014) ("When the victim was killed by a gunshot, and no evidence is presented showing the defendant fired the gun unintentionally, the defendant is not entitled to a charge of involuntary manslaughter."); *State v. Morris*, 307 S.C. 480, 484, 415 S.E.2d 819, 821-22 (Ct. App. 1991) (stating under involuntary manslaughter the act must be unintentional and defendant had intentionally shot his gun although he claimed self-defense).

Clark argues the PCR court erred in not finding trial counsel ineffective for not objecting to the trial court's jury instruction that malice may be inferred when the defendant uses a deadly weapon because there was evidence in the record that could reduce the murder charge to an involuntary manslaughter charge.  He contends the record does not support the PCR court's finding that there was no evidence "that would mitigate, reduce, excuse, or justify the murder."  Clark asserts the State did not present any evidence of malice beyond the use of a deadly weapon; thus, the jury instruction was not harmless.

At Clark's trial, the trial court charged the jury that,

> Inferred malice may . . . arise when the deed is done with a deadly weapon.  A deadly weapon is any article, instrument[,] or substance which is likely to cause death or great bodily harm.  And whether an instrument has been used as a deadly weapon depends on the facts and circumstances of each case.

Neither the State nor the defense made any objections to the jury charge.

At the PCR hearing, trial counsel admitted he did not object to the trial court's jury instruction on inferred malice resulting from the use of a deadly weapon.  Trial counsel further admitted that at the time of Clark's trial, he was not aware of *Belcher*, which was decided about a month prior to Clark's trial.  He stated he did not recall *Belcher* at the time of the PCR hearing, and he did not know if he would have argued *Belcher* applied in Clark's case.  Clark testified the trial court gave the jury a charge on inferred malice, and trial counsel did not object to the charge.

The PCR court found Clark "failed to meet his burden of proving trial counsel should have objected to the jury charge regarding an inference of malice."  In particular, the PCR court found *Belcher* inapplicable to Clark's case because "there was no evidence presented at trial that would mitigate, reduce, excuse, or justify

the murder for which a jury found [Clark] guilty." The PCR court found trial counsel was not deficient for failing to object to the jury charge, and trial counsel's representation did not prejudice Clark.

This issue is not preserved for our review because Clark never argued to the PCR court that he was entitled to a jury instruction on the lesser-included offense of involuntary manslaughter. "It is axiomatic that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial judge to be preserved for appellate review." *Wilder Corp. v. Wilke*, 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998); *see also State v. Freiburger*, 366 S.C. 125, 134, 620 S.E.2d 737, 741 (2005) (holding an issue is not preserved for appeal where one ground is raised below and another ground is raised on appeal).[5]

**CONCLUSION**

Accordingly, the decision of the PCR court is

**AFFIRMED.**

**SHORT, THOMAS, and GEATHERS, JJ., concur.**

---

[5] Even if we addressed this issue, the supreme court's recent decision in *Burdette*, 427 S.C. at 504-05, 832 S.E.2d at 583, stated, "today's ruling will not apply to convictions challenged on post-conviction relief." *Id.* Therefore, trial counsel's decision not to object to the inferred malice jury instruction did not constitute deficient performance in this case.