**THIS OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

The State, Respondent,

v.

Mimi Joe Marshall, Appellant.

Appellate Case No. 2017-002329

Appeal From Richland County
Robert E. Hood, Circuit Court Judge

Unpublished Opinion No. 2020-UP-241
Submitted May 1, 2020 – Filed August 12, 2020

**AFFIRMED**

Stephen Francis Krzyston, of Cavanaugh & Thickens, LLC, of Columbia, and Chief Appellate Defender Robert Michael Dudek, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Deputy Attorney General Donald J. Zelenka, Senior Assistant Deputy Attorney General Melody Jane Brown, and Assistant Attorney General Caroline M. Scrantom, all of Columbia, for Respondent.

**PER CURIAM:** In 2017, a Richland County jury convicted Mimi Joe Marshall (Appellant) of murder in the 2015 shooting death of his wife, Doris Marshall (Victim). Victim was shot in the head with a double barrel shotgun. Prior to trial, Appellant pled guilty to possession of a firearm by a person convicted of a violent felony.[1] The circuit court sentenced Appellant to life without the possibility of parole for murder, concurrent with five years on the weapons charge. This appeal followed.

**FACTS**

Victim worked as a dining facility attendant at Fort Jackson. She lived in a trailer (the trailer) in Richland County with Appellant, her husband. Leslie Brown, a neighbor of Victim and Appellant, testified that on the morning of August 15, 2015, Victim's daughter came to Brown's house yelling "she's dead," and Brown kicked down the door to the trailer. Brown saw Victim on the sofa and called 911. Victim's daughter testified she saw Victim on the sofa and immediately knew she was dead because "she had a hole in her head."

EMT Woodie Boykin testified that when he arrived at the trailer on the morning of August 15, the police were at the scene. A deputy escorted him to the trailer where he stood at the front door and observed Victim without entering the trailer. Victim was sitting on the sofa to the right of the front door and was leaning to the right with her head down. Boykin saw that Victim was dead upon arrival, with an injury to the head "inconsistent with life, skull fragment on the back of the couch, noted brain matter, blood [spatter] around the patient."

Appellant's nephew, Robert Marshall Jr., testified Appellant came to his house (where he lived with his father, Appellant's brother (Marshall Sr.)) early on the morning of August 15. Appellant said he knew he "messed up." Appellant told Marshall Jr. and Marshall Sr. that he argued with Victim and "she ended up trying to grab the gun from him and it went off." Appellant had a double barrel shotgun with him. Appellant said to call the police and then left.

Based on a 911 call and other information, Appellant was apprehended by the police later in the day on August 15 at Tony's Lounge, about ten miles from the crime scene. Appellant had blood spatter on his pants, socks and shoes.

---

[1] Appellant had a prior conviction for assault and battery with intent to kill.

Timothy Lee was qualified by the court as an expert witness in crime scene processing. Lee processed the crime scene before and after Victim's body was removed. Lee described the process of photographing the crime scene, and explained to the jury what was shown in the photos of the crime scene. He noted that the photos showed blood stains on the blinds and couch, as well as gelatinized blood on the couch where the victim was sitting. There were shotgun pellets on the sofa and an unfired shotgun shell on the coffee table in front of Victim. There were also blood stains on the ceiling above Victim. Lee moved the coffee table off of the rug in front of Victim, and there were shotgun pellets on the rug that had been underneath the coffee table. Lee stated, without contemporaneous objection from Appellant, that shotgun wadding found on the sofa showed "that the shot occurred within the parameter of where the body was." When Lee was asked what the purpose of shotgun wadding was, Appellant objected to the scope of the question.

Lee then testified that the photo of the sofa showed "an area where the injury let the most blood out. There was blood letting right there. There was an injury right there." During cross examination, Lee testified that he did not use roadmapping or stringing techniques when photographing the scene because the scene did not warrant it. He stated that a "shotgun blast, it goes all over the place. . . . We see the injury, so we're looking at the overall from the injury to help determine did it come from this area. It probably did. What more do we need to determine? . . . There wasn't dragging from one side of the house . . . to reconstruct." On redirect, Lee opined that the void of blood behind Victim when they moved her body showed that she was on the couch when she was shot. He stated his opinion was also formed by "[t]he brain . . . nearby. There was a chunk of skull and scalp that was up on top of the couch." Lee explained the "majority of the blood was contained from the wound area to . . . if you were looking at her to the left of the room."

Dr. Amy Durso performed the autopsy on Victim. She reconstructed the large gaping wound on Victim's skull to about three inches. She opined the trajectory of the shot was from the front of Victim's face to the back, upwards. From stippling marks, Durso estimated the shotgun was no more than thirty inches away from Victim's face. Because there was no soot, the shotgun would not have been closer than 12 inches from Victim's face.

Stan Richards was qualified by the court as an expert in blood stain pattern analysis. Richards testified to his certifications as a footwear examiner, crime scene investigator, and blood stain pattern examiner. He stated he used nationally

recognized and peer reviewed scientific standards and methodology. He explained in camera that at this crime scene there was only one blood pattern "and it was a radiating impact of spatter that generated from the victim outward. That's why there was no . . . roadmapping done." Appellant objected to Richards's testimony because it did "not conform with the typical methodology employed by the field." The court rejected Appellant's argument as speculation, stating there was no evidence the methodology used was improper. The court declared "Mr. Richards is more than qualified as an expert in blood stain pattern analysis. . . . Whether or not they did roadmapping . . . is an issue that goes to weight and not admissibility."

In front of the jury, Richards testified that during his inspection of the crime scene, he saw some biological matter "inside right at the doorway on the floor. No major blood in that area. The major blood was to begin with Victim on the sofa and continued down the side." Richards explained the steps he takes when looking for blood pattern and explained he found impact spatter. It was not "a lot of different stain patterns or blood patterns, [it was] one massive one and then a couple small ones." He testified that the type of blood spatter found on Victim's leg showed she was sitting, rather than standing, when shot. A portion of Victim's scalp was found on the sofa directly behind Victim "coming out the back of her head." Victim had to be seated for the scalp portion to be in that spot. Richards stated there was a void behind and under Victim on the sofa. Richards used motion, directionality, angle, and other methods to conclude Victim was sitting on the sofa when the bloodletting event occurred. Richards further noted that the blood stains at the crime scene were not adequate for the use of the stringing technique. He found no evidence that a blood letting event occurred anywhere else at the scene.

Investigator Joe Clarke questioned Appellant after he was apprehended at Tony's Lounge. Clarke read Appellant's signed statement to the jury, and recounted the interrogation. Clarke testified that Appellant said he shot Victim when she came home from work around 10:00-11:00 p.m. on August 14. Appellant said he was holding his gun in the front room of the trailer "because the trailer park is an unstable place." Appellant stated, "She came at me. She grabbed the gun. It went up and went off. I grabbed her. I had her head in my hands and I let her down on the chair. I knew she was dead then." Appellant claimed he shot Victim at the front door. After further questioning, Appellant stated:

> I told her when she came in the house that I had just
> called her job. She was a little late and I was worried
> about her. I had just had the car's front end alignment
> fixed with a new tire for her safety. She comes in with

an attitude.  I told her I was worried about her.  She says 'you've got no reason to worry about me.'  She said it with an attitude.  We were just talking at each other.

Appellant's statement also said:

My gun was laying against the wall the whole time. When I decided to check out around my trailer with my shotgun Doris was coming in the front door.  We are right there at the same time.  She comes in the door that is when I told her I was worrying about her.  That is when the gun went off.  She had touched the gun when it went off.  She took the gun and threw it up.[2]

Appellant then told Clark that Victim was standing on the side of the couch when the gun went off, and Appellant held her by the face and laid her on the couch. Appellant also acknowledged he was a convicted felon and was not supposed to have a firearm.

At the close of the State's case, the trial court reiterated its reasoning behind the qualification of the expert witnesses, stating:

I find that every expert called by the State clearly falls under Rule 702 and its progeny.  Number one, the subject matter testified to by all of the State's experts [was] beyond any jury's ordinary knowledge.  Number two, the experts had all testified, acquired the requisite knowledge and skill to qualify as an expert in the area of their subject matter and the substance of the testimony was reliable and, in some cases, completely unchallenged by the Defense.  As to the scientific evidence that was introduced, I find that it was peer reviewed.  There was appropriate application of the method to the type of the evidence in the case and that the quality control used ensured reliability and the methods were consistent with recognized scientific laws and procedures.  The State clearly established and met [its] burden of showing that

---

[2] At trial, Clarke demonstrated that Appellant swiped his hand in the air when asked what "threw it up" meant.

the witnesses possessed the necessary learning, skill
and/or practical experience to enable the witnesses to
give his or her opinion in his or her specific area of
expertise.  The court has clearly performed its
gatekeeping function as it relates to 702 evidence.

Appellant presented an expert witness, Christopher Robinson, qualified by the court in crime scene reconstruction, blood spatter analysis and firearms analysis. Robinson examined the shotgun and said the safety was not functioning properly. He stated the trigger pull was functioning properly.  Based on Appellant's statements, the State's experts' reports, and photos of the scene, Robinson concluded the shot was no more than three to four inches away from Victim's head. Robinson also opined that Victim was not seated when shot, but must have been standing.

The jury found Appellant guilty of murder, and the trial court sentenced Appellant to life without the possibility of parole.

## ISSUES

1.  Did the trial court err in refusing to charge the jury on involuntary manslaughter?

2.  Did the trial court err in admitting the testimony of Timothy Lee and Stan Richards as experts for the State?

## LAW/ANALYSIS

**Involuntary Manslaughter**

Appellant alleges error in the trial court's refusal to give a requested jury charge on involuntary manslaughter.[3]  The trial court relied on *State v. Reese,*[4] and found there was direct evidence Appellant pointed the shotgun at Victim.

"The law to be charged to the jury is determined by the evidence presented at trial." *State v. Hill*, 315 S.C. 260, 262, 433 S.E.2d 848, 849 (1993).  The trial court is required to charge a jury on a lesser-included offense if there is evidence from which it could be inferred that the defendant committed the lesser, rather than the greater, offense.  *State v. Drafts*, 288 S.C. 30, 32, 340 S.E.2d 784, 785 (1986); *see also State v. Gourdine*, 322 S.C. 396, 472 S.E.2d 241 (1996).  "In determining whether the evidence requires a charge on a lesser included offense, the court views the facts in a light most favorable to the defendant."  *State v. Brayboy*, 387 S.C. 174, 179, 691 S.E.2d 482, 485 (Ct. App. 2010).

Involuntary manslaughter is defined as the unintentional killing of another without malice while engaged in either (1) the commission of some unlawful act not amounting to a felony and not naturally tending to cause death or great bodily harm, or (2) the doing of a lawful act with a reckless disregard for the safety of others.  *State v. Tucker*, 324 S.C. 155, 170, 478 S.E.2d 260, 268 (1996).

Here, Appellant claims he was entitled to a charge of involuntary manslaughter because "evidence crucially exists from which the jury could have found that Appellant lawfully armed himself in self-defense and that the shooting was unintentional."  The State maintains that Appellant was pointing and presenting a firearm at Victim at the time of the shooting, it was not lawful for him to arm himself, and he did not arm himself in self-defense.

We find there is no evidence in the record that Appellant was lawfully armed in self-defense.[5]  We note

---

[3] The trial court did give the jury a requested accident charge.  *See State v. Goodson*, 312 S.C. 278, 282 n.1, 440 S.E.2d 370, 373 n.1 (1994) ("We reject the State's claim that because Goodson unlawfully possessed a firearm, the defense of accident is precluded.").

[4] 370 S.C. 31, 633 S.E.2d 898 (2006), *overruled on other grounds by State v. Belcher*, 385 S.C. 597, 685 S.E.2d 802 (2009).

[5] To establish self-defense the defendant must establish the following elements: 1) the defendant must be without fault in bringing on the difficulty; 2) the defendant must have actually believed he was in imminent danger of losing his life or sustaining serious bodily injury, or he actually was in such imminent danger; 3) if

there is a difference between being armed in self-defense and acting in self-defense, and that at the point of the analysis of determining whether one is armed in self-defense, the court is 'concerned only with whether [the defendant] had a right to be armed for purposes of determining whether he was engaged in a lawful act, i.e. was lawfully armed, and not whether he actually acted in self-defense when the shooting occurred.'

*Brayboy*, 387 S.C. at 181, 691 S.E.2d at 486 (quoting *State v. Light*, 378 S.C. 641, 648 n. 6, 664 S.E.2d 465, 468 n. 6 (2010)).  Here, while Appellant stated he was holding the shotgun because of a vague belief the trailer park was an "unstable" place, there is absolutely no evidence that Appellant believed he was in imminent danger of losing his life or sustaining serious bodily injury.

Appellant relies on *State v. Burriss*, 334 S.C. 256, 513 S.E.2d 104 (1999) and *State v. Crosby*, 355 S.C. 47, 584 S.E.2d 110 (2003) in his argument that the trial court should have charged involuntary manslaughter.  However, in *Burriss*, there was evidence in the record to show the appellant was lawfully armed in self-defense when engaged in a fight with two other men.  Likewise, in *Crosby*, there was testimony from the appellant that he feared his life was in danger during an altercation.  Such circumstances do not exist in the present case.

Further, when viewed in the light most favorable to Appellant, there is evidence Appellant was pointing or presenting the shotgun at Victim.  As stated in *Reese*, which was relied on by the trial court, "there is no doubt that [Appellant] was *presenting* a firearm when he took the gun out and began [waving] it around.  Therefore, [Appellant] was pointing or presenting a firearm, a felony, which would preclude an involuntary manslaughter charge."  *Reese*, 370 S.C at 36, 633 S.E.2d at 901 (emphasis in original).  Here, Appellant stated he was holding the shotgun

---

his defense is based upon his belief of imminent danger, a reasonably prudent man of ordinary firmness and courage would have entertained the same belief; if the defendant actually was in imminent danger, the circumstances were such as would warrant a man of ordinary prudence, firmness, and courage to strike the fatal blow to save himself from serious bodily harm or losing his own life, and; 4) the defendant had no other probable means of avoiding the danger of losing his own life or sustaining serious bodily injury than to act as he did in this particular instance. *State v. Davis*, 282 S.C. 45, 46, 317 S.E.2d 452, 453 (1984).

when Victim came into the trailer "with an attitude" and they began "talking at each other."  Appellant's signed statement shows he presented the firearm to Victim, which precludes an involuntary manslaughter charge.

Accordingly, there is no evidence in the record to support a charge of involuntary manslaughter.

**Expert Witnesses (Lee/Richards)**

Appellant argues the trial court erred in permitting Timothy Lee to exceed the scope of his expertise by testifying blood stains on certain areas of the sofa indicated Victim's injury occurred on the sofa.  Appellant argues the "evidence was unreliable and the Court's decision to admit Lee's opinion was based not on evidence in the record but blind faith."

As to his qualifications, Lee testified he had attended over 500 hours of crime scene processing courses, and a ten-phase in house training course.  He also attended advanced courses (including blood pattern analysis, reconstruction and DNA analysis) and explained he was a certified crime scene investigator through the International Association of Identification.  During Appellant's in camera cross examination, Lee stated he was prepared to give his opinion on "what we did, what we looked at based on the blood at the scene."  The trial court qualified Lee as an expert in crime scene processing.

During testimony, Appellant objected when Lee stated a particular photo showed "the limited amount of blood staining over here . . . so that gives us an indication that a blood letting event occurred within."  In camera, Appellant argued Lee's testimony was "squarely within the realm of blood spatter, which they have not qualified him as an expert."  The trial court then questioned Lee, who explained that his training taught him to examine certain blood stains and other evidence to lead him to the pivotal areas to investigate at a crime scene.  The trial court allowed Lee to testify over Appellant's objection, ruling it was "completely and totally within his expertise.  He's certified.  He's been through the classes.  He's going to be allowed to give opinion testimony.  This goes to its admissibility.  It's clearly admissible.  The defense will be allowed to cross-examine as to the weight issues."  Appellant re-stated his objection on the grounds of "702, *White*, *Council* and *Jones*."  Appellant further objected, stating "our problem is with the methodology."  When his testimony continued, Lee told the jury the photo of the blood stains on the sofa showed "an area where the injury let the most blood out.  There was a blood letting right there.  There was an injury right there.  There was

blood.  That is where I think that I need to concentrate my searching for to look for any additional evidence."

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."  Rule 702, SCRE.  "[A]n expert's testimony may not exceed the scope of his expertise."  *State v. Commander*, 396 S.C. 254, 264, 721 S.E.2d 413, 418 (2011).  "[T]he trial courts of this state have a gatekeeping role with respect to all evidence sought to be admitted under Rule 702, whether the evidence is scientific or nonscientific."  *State v. White*, 382 S.C. 265, 274, 676 S.E.2d 684, 689 (2009).

> When admitting scientific evidence under Rule 702, SCRE, the trial [court] must find the evidence will assist the trier of fact, the expert witness is qualified, and the underlying science is reliable.  The trial [court] should apply the *Jones*[6] factors to determine reliability.  Further, if the evidence is admissible under Rule 702, SCRE, the trial [court] should determine if its probative value is outweighed by its prejudicial effect.  Once the evidence is admitted under these standards, the jury may give it such weight as it deems appropriate.

*State v. Council*, 335 S.C. 1, 20-21, 515 S.E.2d 508, 518 (1999).

> In considering the admissibility of scientific evidence under the *Jones* standard, the [c]ourt looks at several factors, including: (1) the publications and peer review of the technique; (2) prior application of the method to the type of evidence involved in the case; (3) the quality control procedures used to ensure reliability; and (4) the consistency of the method with recognized scientific laws and procedures.

---

6 *State v. Jones*, 273 S.C. 723, 259 S.E.2d 120 (1979).

*Id.* at 19, 515 S.E.2d at 517. "A trial court's decision to admit or exclude expert testimony will not be reversed absent a prejudicial abuse of discretion." *White*, 382 S.C. at 269, 676 S.E.2d at 686.

Here, the scope of Lee's testimony did not exceed the scope of his expertise. During his initial in camera testimony, Lee explained he would testify about why he would photograph certain blood stains. He expounded on that area of testimony when he was questioned by the trial court. He explained that he had blood stain analysis training. As Lee testified in front of the jury, he explained how his training led him to photograph certain areas and collect evidence. The trial court was within its discretion to admit Lee's testimony because it met all the factors discussed in *Council*, *Jones*, and *White*. Lee's testimony was consistent with his qualifications and the area of his expertise.

Appellant also argues the trial court erred in admitting the testimony of Stan Richards because it did not comply with the *Council* factors. We disagree. At trial, Appellant did not argue the methodology used by Richards was improper, and instead argued "it wasn't complied with." Appellant argued "they are sending these guys to training to learn high quality, highly technical issues and then the roadmapping has not been used." As the trial court noted, this argument goes to the weight of the evidence for the jury, not its admissibility. *See White*, 382 S.C. at 273-74, 676 S.E.2d at 688 (2009) (noting an expert witness "may satisfy the Rule 702 threshold yet the opponent may still challenge the amount or quality of the qualifications. . . ."); *Small v. Pioneer Mach., Inc.*, 329 S.C. 448, 470, 494 S.E.2d 835, 846 (Ct. App. 1997) ("Where the expert's testimony is based upon facts sufficient to form the basis for an opinion, the trier of fact determines its probative value."). As the trial court noted, Richards had been "to class upon class upon class on this issue. He is certified. There are no issues with his qualifications. There are no issues with the science in this case." We find the trial court properly performed its gatekeeping role under Rule 702, SCRE, and did not commit an abuse of discretion in allowing Richards's testimony.

Accordingly, because the trial court did not err in refusing to charge the jury on involuntary manslaughter and did not err in allowing the expert testimony of Lee and Richards, Appellant's convictions are

**AFFIRMED.**[7]

---

[7] We decide this case without oral argument pursuant to Rule 215, SCACR.

**HUFF, THOMAS, and MCDONALD, JJ., concur.**